946 F.2d 895
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
Josephine Christine HIGGS and Kenneth Higgs, Plaintiffs-Appellants,
v.
Gary LATHAM, Individually and in his official capacity as
Facility Director of Western State Hospital; Flora B.
Porciuncula, Individually and as Agent for the Commonwealth
of Kentucky; Joyce Stofer, Individually and as Agent for
the Commonwealth of Kentucky, Harry Cowherd, Individually
and in his official capacity as Secretary for the Cabinet
for Human Resources, Defendants-Appellees.
 No. 91-5273.
 United States Court of Appeals, Sixth Circuit.
 Oct. 24, 1991.
 
 Before MILBURN and SUHRHEINRICH, Circuit Judges, and JOHN W. PECK, Senior Circuit Judge.
 PER CURIAM.
 
 
 1
 Plaintiffs Josephine and Kenneth Higgs appeal the summary judgment granted to the defendants in this civil rights action alleging sexual assault on a mental health patient. The issue on appeal is whether Josephine Higgs, a patient in a Kentucky mental hospital, had an actionable constitutional right under the Due Process Clause of the Fourteenth Amendment to protection from sexual assault by another patient. For the reasons that follow, we affirm.
 
 I.
 
 2
 Plaintiffs Josephine Higgs and her husband, Kenneth Higgs, filed this action seeking monetary damages and injunctive relief under 42 U.S.C. § 1983 alleging that Mrs. Higgs was sexually assaulted by a fellow patient while she was temporarily but involuntarily committed to Western State Hospital ("Western State"), an institution operated by the Commonwealth of Kentucky. Plaintiff Josephine Higgs also asserted pendent state law claims grounded in negligence, and Kenneth Higgs asserted a separate claim for loss of consortium. The defendants are all officers or employees of the Commonwealth of Kentucky or its institution, Western State Hospital.
 
 
 3
 According to her husband's deposition testimony, Mrs. Higgs' mental condition had deteriorated in June, 1988, to the point that "she was talking to her dead father; she was seeing heaven and hell. She was just out of it." Mrs. Higgs' personal physician, Dr. Skaggs, and the Grayson County attorney conferred with Mr. Higgs, and as a result of their discussions, Mr. Higgs signed and filed a petition on July 7, 1988, for the involuntary hospitalization of his wife. This petition resulted in a proceeding before Grayson County district judge, R. Randolph Behnken, who found probable cause to believe that Mrs. Higgs was mentally ill and set the matter for trial for July 18, 1988. He further ordered that Mrs. Higgs "be detained at Western State Hospital ... pending a Final Hearing as stated heretofore in this Order." The preliminary hearing which resulted in the order of temporary detention occurred at approximately 4:30 p.m. on July 7, 1988.
 
 
 4
 On July 8, 1988, Mrs. Higgs was transported by ambulance from the Grayson County Hospital to Western State Hospital. She was not permitted to ride to Western State Hospital with her husband because the authorities were fearful that she might jump from the car or otherwise injure herself. During the ambulance trip, Mrs. Higgs was not permitted to sit up but was instead "strapped down."
 
 
 5
 Upon her arrival at Western State Hospital, Mrs. Higgs executed all the necessary forms to have herself admitted as a voluntary patient, and she was in fact admitted on that basis because Western State Hospital was never apprised of Judge Behnken's order of temporary detention. Indeed, the hospital was never informed that any judicial proceeding was pending against Mrs. Higgs. Susan Williams, a social worker at Western State Hospital, testified in her deposition that she took the referral information by telephone from Arma Terry of the Grayson County Comprehensive Care Center on July 7, 1988. Ms. Williams was apparently advised that the commitment was a voluntary one, and she accordingly noted that information on all the appropriate admission documents. She stated that if Ms. Terry had told her that a petition for involuntary commitment was pending against Mrs. Higgs, "then it wouldn't have been a voluntary admission."
 
 
 6
 The telephone referral was apparently made at 1:05 p.m. on July 7, 1988, and the preliminary hearing before Judge Behnken was not scheduled until 4:30 p.m. that day. Thus, no mention was made of a temporary commitment order to the hospital during the telephone referral as a commitment order had not been issued as of that time. When Mrs. Higgs arrived at Western State the next day, July 8, 1988, no court orders or papers accompanied her. The hospital and its employees were therefore unaware of the temporary commitment order at all times material to this action.
 
 
 7
 All the defendants filed motions for summary judgment, and the district court granted them on the basis of its conclusion that the "evidence is overwhelming and conclusively shows that Higgs voluntarily admitted herself to Western State on July 8, 1988." The district court disagreed with the recommendations of the magistrate judge, who found there was a genuine issue of fact as to whether Mrs. Higgs was voluntarily or involuntarily admitted to the hospital. Having concluded that all defendants were entitled to summary judgment on plaintiffs' constitutional claims under 42 U.S.C. § 1983, the district court also dismissed the plaintiffs' pendent state law claims without prejudice, and this timely appeal followed.
 
 
 8
 The principal issue on appeal is whether Josephine Higgs had a constitutional right to a safe and secure environment at Western State Hospital. This issue turns on the question of whether or not the Commonwealth of Kentucky deprived her of her freedom to act on her own behalf.
 
 II.
 A.
 
 9
 Summary judgment is appropriate where there is no genuine issue of material fact, and the moving parties are entitled to a judgment as a matter of law. Fed.R.Civ.P. 56. A district court's grant of summary judgment is reviewed de novo. Pinney Dock & Transp. Co. v. Penn Cent. Corp., 838 F.2d 1445, 1472 (6th Cir.), cert. denied, 488 U.S. 880 (1988). In our review, we will view all facts and inferences drawn therefrom in the light most favorable to the nonmoving parties. 60 Ivy St. Corp. v. Alexander, 822 F.2d 1432, 1435 (6th Cir.1987).
 
 
 10
 In Youngberg v. Romeo, 457 U.S. 307 (1982), the Supreme Court held that a person involuntarily committed to a state institution for the mentally retarded has substantive rights under the Due Process Clause of the Fourteenth Amendment, the violation of which are actionable under 42 U.S.C. § 1983. One of those substantive rights is the "right to personal security," a right that "is not extinguished by lawful confinement, even for penal purposes." Id. at 315. The district court, relying on Youngberg, held that "voluntarily admitted individuals have no established Constitutional right to a safe and secure environment...."
 
 
 11
 The Supreme Court, however, did not go quite that far because it did not hold that voluntarily admitted persons did not have a constitutional right to personal safety. It merely held that involuntarily committed persons did have that right. Thus, Youngberg is conclusive of the issue only if Mrs. Higgs is found to have been an involuntary patient at Western State Hospital. If she was a voluntary patient, however, a question remains about the scope of her rights under the Due Process Clause of the Fourteenth Amendment and their actionability under 42 U.S.C. § 1983.
 
 
 12
 In our view, our decision in this case is determined by DeShaney v. Winnebago County Dept. of Social Serv., --- U.S. ----, 109 S.Ct. 998 (1989), a case not cited by the district court. In DeShaney, a four-year-old child was beaten to the point of severe brain damage by his father. The boy's mother brought a civil rights action under 42 U.S.C. § 1983 against certain state social workers and local officials who had received complaints that the boy was being abused by his father but had not removed him from his father's custody. The mother alleged that the state was aware of the risk that the father presented to the child and failed to intervene to protect the child from that risk. The Supreme Court held that the state had no constitutional duty to protect the boy from his father because it had done no affirmative act to restrain the boy's freedom and therefore had not deprived him of his liberty. Id. at 1006-07.
 
 
 13
 In discussing Youngberg, the Supreme Court in DeShaney stated that the case stood
 
 
 14
 only for the proposition that when the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being. The rationale for this principal is simple enough: when the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs--e.g., food, clothing, shelter, medical care, and reasonable safety--it transgresses the substantive limits on state action set by the Eighth Amendment and the Due Process Clause.
 
 
 15
 Id., --- U.S. at ----, 109 S.Ct. at 1005-06 (citations omitted).
 
 
 16
 The Court thus focused its attention on the kind of restraint that disables a person from caring for himself. It went on to state this proposition clearly:
 
 
 17
 The affirmative duty to protect arises not from the State's knowledge of the individual's predicament or from its expressions of intent to help him, but from the limitation which it has imposed on his freedom to act on his own behalf. In the substantive due process analysis, it is the State's affirmative act of restraining the individual's freedom to act on his own behalf--through incarceration, institutionalization, or other similar restraint of personal liberty--which is the "deprivation of liberty" triggering the protections of the Due Process Clause, not its failure to act to protect his liberty interests against harms inflicted by other means.
 
 
 18
 Id., --- U.S. at ----, 109 S.Ct. at 1006 (citations omitted).
 
 
 19
 In this case there was an attempt by the Commonwealth of Kentucky on July 7, 1988, to restrain Mrs. Higgs' freedom by confining her to Western State Hospital pending the hearing on her involuntary commitment, which was scheduled for July 18, 1988. This attempt was mishandled, however, because Judge Behnken's order was never communicated to Western State Hospital. An unexecuted and unknown court order does not accomplish an actual restraint.
 
 
 20
 If there were to have been an active agent of restraint in this case, it could only have been Western State Hospital. However, the hospital was unaware of any commitment order and had been led by a telephone referral to believe that Mrs. Higgs' admission would be a voluntary one. Mrs. Higgs signed all the necessary papers for a voluntary admission, and the hospital did in fact admit her on that basis. Accordingly, it took no action to confine her or restrict her liberties. Thus, there was no "affirmative act" by the hospital to deprive her of liberty, and therefore no triggering of the state's constitutional duty to protect those it renders helpless by confinement.[1]
 
 
 21
 Plaintiffs rely heavily on Society for Good Will to Retarded Children v. Cuomo, 737 F.2d 1239 (2d Cir.1984), a case in which the Second Circuit refused to limit the right to safe conditions to involuntarily committed residents and extended it to those voluntarily admitted. Society for Good Will is of questionable authority in light of the Supreme Court's subsequent holding in DeShaney, and it has been criticized in a recent case holding that voluntary residents at a state facility for the severely retarded have no constitutional rights to a safe environment. Jordan v. Tennessee, 738 F.Supp. 258, 260 (M.D.Tenn.1990).
 
 
 22
 Goodman v. Parwatikar, 570 F.2d 801 (8th Cir.1978), relied on by plaintiffs, is similar to Society for Good Will in ignoring the distinction between patients voluntarily and involuntarily admitted to state institutions. It is therefore subject to the same infirmities in view of DeShaney's emphasis on state restraint as a condition precedent to a constitutional claim for failure to protect.
 
 
 23
 Plaintiffs also seek to rely on this court's decision in Davis v. Holly, 835 F.2d 1175 (6th Cir.1987). However, that case held only that a mental patient had no clearly established constitutional right to be protected from an isolated instance of rape in 1979 by a staff member of a mental hospital. It did not decide the more basic question of whether or not a voluntarily admitted patient has a constitutional right of action against state officials for injuries such as plaintiffs allege. Moreover, it is inferable that the plaintiff in Davis was an involuntary patient, although the case is not clear on the point.
 
 
 24
 None of the cases cited by plaintiff take into account DeShaney's analysis of restraint as the mechanism that triggers the constitutional right to a safe and secure environment. If the district court was correct in concluding that Mrs. Higgs was a voluntary patient at Western State Hospital, then it follows that she had no constitutionally based right of action against any of the defendants under 42 U.S.C. § 1983.
 
 Plaintiffs charge in their complaint that
 
 25
 due to statements by the agents for the Commonwealth of Kentucky that a voluntary commitment by plaintiff would result in a shorter duration of confinement than the sixty-day involuntarily commitment urged by the Commonwealth and due to coercion by the Commonwealth, Christine [Higgs] was hospitalized at the Western State Hospital facilities in Hopkinsville, Kentucky. At the time of the commitment of Christine to Western State Hospital she was delusional, incompetent, and incapable of forming an intelligent and informed decision concerning commitment. It was a result of pressure by the Commonwealth of Kentucky that she was committed to Western State.
 
 
 26
 Plaintiffs' First Amended Complaint. Plaintiffs now argue that the district court erred in basing its findings of voluntary admission on the hospital's admission records while ignoring her allegedly confused state of mind. They further contend that
 
 
 27
 [t]he question before this court is whether Josephine Higgs voluntarily placed herself into Western State Hospital. This obviously entails determining the state of mind of Josephine Higgs when executing documents at Western State Hospital.
 
 
 28
 Brief of Appellants at 10-11. This invitation to a highly problematical exploration of the state of mind of an acutely ill mental patient should be rejected as perhaps impossible. It is simply too subjective a proposition to undertake.
 
 
 29
 From an objective point of view, however, plaintiffs point to pressure allegedly put on Mrs. Higgs by "Betty," a nurse at Grayson County Hospital where Mrs. Higgs was a patient during the week before she was transported to Western State.[2] According to Mrs. Higgs, "Betty" told her that it would be better for her to admit herself voluntarily to Western State rather than being involuntarily committed there by the law. "Betty's" advice, even if given in the form of an importunity, is insufficient in its coercive effect to function as a constructive confinement because its coercive effect, if any, emanates from the very existence of the state law authorizing involuntary commitments under certain circumstances. Kentucky law on this subject "is to the effect that it is not duress to threaten to do what one has a legal right to do, nor is it duress to threaten to take any measure authorized by law and the circumstances of the case." Redmon v. McDaniel, 540 S.W.2d 870, 872 (Ky.1976). Thus, even if "Betty's" advice had been viewed by Mrs. Higgs as threatening, it did not amount to coercion under Kentucky law and thus constituted, at most, the kind of "merely colorable" evidence that is insufficient to withstand an otherwise well-supported motion for summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).
 
 
 30
 Plaintiffs also imply that the mere pendency of the particular state commitment proceedings before Judge Behnken must have coerced Mrs. Higgs into her decision to enter Western State Hospital. However, they concede in their brief that Mrs. Higgs "never attended any hearings in Grayson County, never spoke to any defense attorney who was allegedly representing her, and was unaware that any hearings had even taken place." Brief of Appellants at 15. Therefore, the pendency of state proceedings could not have had any coercive effect on Mrs. Higgs' decision to enter Western State voluntarily, and the district court's characterization of the plaintiffs' evidence of an involuntary commitment as "merely colorable" seems accurate.
 
 
 31
 We conclude that the district court was correct in holding that, as a matter of law, plaintiffs had no constitutional cause of action against any of the defendants. Therefore, the district court was correct in granting summary judgment and properly exercised its discretion in dismissing the pendent claims without prejudice.
 
 III.
 
 32
 For the foregoing reasons, the judgment of the district court is AFFIRMED.
 
 
 33
 SUHRHEINRICH, Circuit Judge, concurring.
 
 
 34
 The conclusion reached by the majority, which I join, affirms the district court's summary judgment ruling. With all respect, I would bar Higgs's substantive due process claim without recourse to distinctions between voluntary and involuntary acts.
 
 
 35
 I do not read DeShaney to control the outcome of this case. DeShaney v. Winnebago County Department of Social Services et al., 489 U.S. 189 (1989). First, in DeShaney the Court identified custody as the operative criterion for determining constitutional liability for a state's failure to protect a child from private harm. Id. at 199-200. Because Joshua DeShaney was in his father's custody at time of his assault, the state was not liable.
 
 
 36
 By contrast, Higgs was allegedly raped during her stay at the Western State Hospital. Beyond this factual difference, DeShaney held that a state's affirmative duty to protect arises "from the limitation which it has imposed on his freedom to act on his own behalf." Id. at 200. So even DeShaney compels us to go beyond asking whether Higgs was a voluntary admittee. DeShaney demands that we examine the limitations imposed on Higgs while she was a resident at the state hospital.[1] DeShaney's custody test for liability may therefore be met even after it is shown that a patient was voluntary admitted.
 
 
 37
 Second, even though DeShaney involved a non-custodial relationship, the Court still found it necessary to assess the state's role in contributing to the hazards faced by Joshua. For example, the Court determined that "[w]hile the State may have been aware of the dangers that Joshua faced in the free world, it played no part in their creation, nor did it do anything to render him any more vulnerable to them." Id. at 201.
 
 
 38
 What, if anything, did Kentucky do to render Higgs "more vulnerable" to the dangers of a sexual assault at Western State Hospital? Higgs and her husband contend that she would not have "voluntarily" admitted herself in the absence of the probable cause and detention orders issued by the state court. (Jt.App., 59-60; 162-164). It is at least arguable that these judicial orders are the sort of affirmative state action that triggers a § 1893 cause of action. Freeman v. Ferguson, 911 F.2d 52 (8th Cir.1990) ("A constitutional duty to protect an individual may exist in a non-custodial setting if the state has taken affirmative action which increases the individual's danger of, or vulnerability to, such violence beyond the level it would have been at absent state action."). Indeed, the fact that Higgs was transported to the hospital in straps suggests the possibility of an involuntary admission.
 
 
 39
 I regard recent Supreme Court decisions limiting due process claims under § 1983 as a better guide. The Court has declared that negligent deprivations of liberty are insufficient to establish a denial of the Due Process Clause of the Fourteenth Amendment. Daniels v. Williams, 474 U.S. 327 (1986); Davidson v. Cannon, 474 U.S. 344 (1986); McKenna v. City of Memphis, 785 F.2d 560 (6th Cir.1986). Daniels and Davidson teach that "the Due Process Clause of the Fourteenth Amendment is not implicated by the lack of due care of an official causing unintended injury to life, liberty, or property." Davidson, at 347. So Higgs must prove at least deliberate indifference or gross negligence, if not intentional deprivation. Id. This court has found gross negligence to be enough to trigger a § 1983 cause of action. Nishiyama v. Dickson County, Tenn., 814 F.2d 277 (6th Cir.1987). We have described gross negligence as an intentional and unreasonable act committed "with disregard to a known risk or a risk so obvious that he must be assumed to have been aware of it." Id. at 282.
 
 
 40
 The alleged rape was committed by another patient. Higgs complains of negligent supervision by the hospital and of malpractice by the admitting psychiatrist. Neither complaint, however, rises above the level of an ordinary tort. Despite attaching the label "gross negligence" to the defendants' acts, Higgs fails to show how they intentionally and unreasonably disregarded a known risk to her safety and security. Jones v. Sherrill et al., 827 F.2d 1102, 1106 (6th Cir.1987) ("Negligence does not become 'gross' just by saying so."). Higgs's failure to satisfy the heightened state-of-mind requirement seals the fate of this appeal. We are bound by the Supreme Court's directive to refrain from turning every ordinary tort into a federal case. Paul v. Davis, 424 U.S. 693, 701 (1976) (The Due Process Clause of the Fourteenth Amendment is not "a font of tort law to be superimposed upon whatever systems may already be administered by the States.").
 
 
 
 [1]
 At oral argument counsel for the plaintiffs conceded that under Kentucky law one who is voluntarily committed to a mental hospital has the right to leave the hospital at any time following the voluntary admission
 
 
 [2]
 "Betty's" connection with the Commonwealth of Kentucky is not established in the record
 
 
 [1]
 At oral argument counsel for appellant observed that Higgs asked to leave Western State Hospital and permission was refused