Nancy MARTIN, et al., Plaintiffs,

v.

George VOINOVICH, et al., Defendants.

No. C–2–89–362.

United States District Court,
S.D. Ohio, E.D.

Dec. 14, 1993.

**1180**

Robert Scott Mills, Columbus, OH, for plaintiffs.

Beverly Pfeiffer and Lisa Sotos, Asst. Atty. Generals, Columbus, OH, for defendants.

## OPINION AND ORDER

GEORGE C. SMITH, District Judge.

Presently before the Court is defendants' consolidated motion to dismiss the second amended class complaint (Complaint) under Fed.R.Civ.P. 12(b). (Doc. 150). Plaintiffs represent a class consisting of persons in Ohio with mental retardation or developmental disabilities. Plaintiffs contend, *inter alia,* that defendants have denied them community housing and other services in violation of plaintiffs' rights under the U.S. Constitution and other federal laws. Plaintiffs assert claims under: § 504 of the Rehabilitation Act of 1973, as amended, 29 U.S.C. § 794; Title II of the Americans with Disabilities Act of 1990, 42 U.S.C. §§ 12131–12150; Title XIX of the Social Security Act, 42 U.S.C. § 1396 et seq. (Medicaid); the Developmental Disabilities Act, 42 U.S.C. §§ 6000–6003; and the due process and equal protection clauses of the Fourteenth Amendment to the U.S. Constitution.[1]

### I.

Plaintiffs, Nancy Martin, Kathy R., Claude Martin, and Allen T.,[2] represent a class consisting of all persons in Ohio with mental retardation[3] or developmental disabilities[4]

---

1. Plaintiffs' constitutional claims, as well as their claims under the Social Security Act and the Developmental Disabilities Act, are asserted under 42 U.S.C. § 1983.

2. Ohio Legal Rights Service (OLRS) brings this action on behalf of Kathy R. and Allen T. OLRS has been designated as the Protection and Advocacy System agency in Ohio as required by Subchapter III of the Developmental Disabilities Act, 42 U.S.C. § 6042. This federal statute and O.R.C. § 5123.60(G) authorizes OLRS to initiate legal and equitable actions on behalf of people in Ohio with developmental disabilities.

3. According to plaintiffs, mental retardation refers to substantial limitations in present function-ing. It is characterized by significantly subaverage intellectual functioning, existing concurrently with related limitations in two or more of the following applicable adaptive skill areas: communication, self care, home living, social skills, community use, self direction, health and safety, functional academics, leisure, and work. Levels of retardation are categorized as mild, moderate, severe, or profound.

4. Plaintiffs define developmental disability as a severe, chronic disability of a person which

 (A) is attributable to a mental or physical impairment or combination of mental and physical impairments;

 (B) is manifested before the person attains age twenty-two;

who are or will be in need of community housing and services which are normalized, home-like and integrated. Complaint, ¶ 142. A subclass consists of all persons who, in addition to being members of the class, are or will be recipients of Medicaid. Complaint, ¶ 143. Plaintiffs seek injunctive and declaratory relief under federal and state laws and the U.S. Constitution to compel defendants to develop community placements and housing options in sufficient numbers to meet the needs of the class.

Defendants are the Governor of Ohio (George Voinovich), the State of Ohio, the Ohio Department of Mental Retardation and Developmental Disabilities (ODMR/DD), Jerome C. Manuel in his capacity as director of ODMR/DD, the Ohio Department of Human Services (ODHS), and Arnold Tompkins in his capacity as director of ODHS.

Plaintiffs contend that they cannot find places to live in the community because defendants have failed to create housing options in sufficient numbers to meet the needs of the class. Plaintiffs further argue that plaintiffs are now living in institutions or other large facilities, when they should be living in the community, or they are now living with their families at home, but are not receiving the services they require to remain in the community and avoid being sent to an institution.

## II.

The following facts are derived from the Complaint. The Court accepts them as correct only for purposes of ruling on defendants' motion to dismiss. Plaintiffs, Nancy

(C) is likely to continue indefinitely;
(D) results in substantial functional limitations in three or more of the following areas of major life activity: (i) self care, (ii) receptive and expressive language, (iii) learning, (iv) mobility, (v) self direction, (vi) capacity for independent living, and (vii) economic self sufficiency; and
(E) reflects the person's need for a combination and sequence of special, interdisciplinary, or generic care, treatment, or other services which arc of lifelong or extended duration and are individually planned and coordinated.

5. Ms. Martin has intelligence within the moderate range of mental retardation. Ms. Martin is confined to an electric wheelchair due to cerebral palsy with spastic quadriplegia. She has

Martin, Kathy R., Claude Martin, and Allen T., represent more than 9,000 people in Ohio who have mental retardation or other developmental disabilities. The backgrounds of the four named plaintiffs are summarized below.

### A. Nancy Martin

Plaintiff Nancy Martin is forty-four years old [5] and currently resides at Echoing Ridge Residential Center, an institution in Canal Fulton, Ohio (Stark County).

In May 1993, Ms. Martin had surgery to insert a Peg Tube. The peg tube is used to administer liquids and medications into her stomach. A Peg Tube became necessary due to increased problems with swallowing, caused by Ms. Martin's physical disabilities. Because of her Peg Tube, Ms. Martin needed twenty four hour nursing staff availability. As a result, she was relocated from Echoing Lake in Lorain County to Echoing Ridge in Stark County.

Echoing Ridge is a more restrictive facility and farther from her family. Because of the relocation, Ms. Martin had to quit her job in a sheltered workshop operated by Lorain County Board of Mental Retardation and Developmental Disabilities (BMR/DD). Ms. Martin is unable to work in a similar setting due to a long waiting list for workshop services provided by the Stark County BMR/DD.

Ms. Martin resided at Mount Vernon Developmental Center from March 30, 1966 through October 9, 1991.[6] Ms. Martin expressed to Mount Vernon staff her desire to move to a community group home. Moreover, staff of ODMR/DD acknowledged for

functional use of only her right hand and arm and moves herself with the use of an electric wheelchair. She has limited ability to speak and usually communicates with her word book, electronic communicator, facial expressions, gestures, verbalizations, pointing, and nodding.

6. Mount Vernon is operated by ODMR/DD for over 30 individuals who have mental retardation and developmental disabilities. Mount Vernon, Echoing Lake, and Echoing Ridge are licensed by ODMR/DD and are certified and funded as Intermediate Care Facilities for the Mentally Retarded (ICF/MR) under the Medicaid program. Martin receives Medicaid benefits. Martin was committed involuntarily.

many years the inappropriateness of Ms. Martin's placement at Mount Vernon. ODMR/DD recommended for many years that Ms. Martin be moved to a community group home. Nevertheless, the habilitation plans [7] for Ms. Martin did not include goals to increase her independence and integration into the community.

A noninstitutional placement in the community has not been and is not available to Ms. Martin, and there are virtually no small noninstitutional community homes for people like Ms. Martin with mental retardation and significant physical handicaps.

## B. Kathy R.

Plaintiff Kathy R. is forty-one years old [8] and currently resides in Gallipolis Developmental Center (GDC) operated by defendants Manuel and ODMR/DD. Throughout her institutionalization, she has been medicated with psychotropic medications. Recently, her medication has been increased. One of the side effects of the medication is akathesia. Akathesia is a subjective feeling that the individual must keep moving.

Kathy R. lived in community residential settings from April 1974 through October 1984. She was reinstitutionalized involuntarily due to her behavioral handicap and mental illness. Kathy R. states that she does not wish to live in GDC and wishes to live in a community group home.

ODMR/DD has determined that an appropriate placement for Kathy R. is in a small licensed group home/foster home which offers 24–hour supervision, behavior management programming, medical services, psychological and/or psychiatric services, social services, community recreational activities, workshop participation, or community based employment. Nevertheless, the habilitation plan for Kathy R. does not include goals for her integration into the community. There are virtually no small community homes for people like Kathy R. with mental retardation and mental illness.

## C. Claude Martin

Plaintiff Claude Martin is forty-five years old [9] and currently resides at Echoing Valley Residential Home in Dayton, Ohio.[10]

Mr. Martin has tried without success to find a place to live that provides semi-independent living with some attendant care services. He wrote to then defendants Celeste and Brown and to the Dayton Daily News. The Dayton Daily News published his letter which expressed his desire to live in a semi-independent living arrangement in the community and explained how he had been denied placements because of his mobility impairment.

A non-institutional placement in the community has not been and is not available to Mr. Martin. Mr. Martin's case manager at the Montgomery County BMR/DD tried

---

7. Habilitation means the process by which the staff of a residential facility or agency assists a person with mental retardation or developmental disabilities to acquire and maintain those life skills which enable him or her to cope more effectively with the demands of his or her own person and environment and to raise to the level of his or her personal, physical, mental, social, and vocational efficiency. (Complaint, n. 6.) Requirements for a habilitation plan are set forth in the Developmental Disabilities Act, 42 U.S.C. § 6023.

8. Kathy R. functions both intellectually and adaptively within the moderate range of mental retardation. She can speak to satisfy her wants and needs, to get and give information, and for social interaction. She has been diagnosed with chronic schizophrenia, and sometimes suffers from auditory hallucinations. Kathy R. is employed on a work crew that cleans two nearby rest areas. Kathy R. is eligible for and receives Medicaid.

9. Mr. Martin has intelligence within the range of mild mental retardation. He functions with severe deficits in adaptive behavior. He is confined to a wheelchair due to his cerebral palsy with spastic quadriplegia. Mr. Martin has excellent communications skills, and can express himself through speech and writing. He can independently feed and groom himself, does his own laundry, and bathes himself but needs help getting in and out of the bathtub. He can move independently with a wheelchair. Mr. Martin uses the bus system independently and works and receives vocational training at the Goodwill center.

10. Echoing Valley is licensed by ODMR/DD, has been certified under Medicaid and ODHS as an intermediate care facility for persons with mental retardation (ICF/MR) and is funded by ODHS. Mr. Martin is eligible for and receives Medicaid benefits.

without success to find a residential placement for Mr. Martin. Mr. Martin is on a residential waiting list in Montgomery County.

Mr. Martin was denied placement at LADD [11] group homes in Cincinnati because of his alleged behavioral handicaps and physical handicaps. Moreover, in August 1990, Choices in Community Living, a residential service provider in Montgomery County, determined that it could not provide services to him in semi-independent placement in part because Mr. Martin is not independent in transferring.

The habilitation plan for Mr. Martin does not include goals for his integration into the community. The plan shows that while Mr. Martin has clearly expressed his preference to live alone in an apartment-like setting, Echoing Valley has been working with him on becoming more receptive to other options, such as group homes or rooming with at least one other person "due to the hindrance of the transferring inability."

· Mr. Martin filed a discrimination complaint with the Office of Civil Rights of the Health Care Financing Administration (HCFA). The complaint alleged that he had been discriminated against on the basis of his mobility impairment by LADD and ODMR/DD. HCFA combined Mr. Martin's complaint with complaints by two other individuals with mental retardation and mobility impairments. HCFA sought a voluntary remedial agreement with ODMR/DD to correct the alleged discrimination. ODMR/DD refused to sign the proposed agreement.

Currently, Mr. Martin is on a waiting list to receive Home and Community Based Waiver services through the Individual Options waiver. All slots that have been approved by the federal government for the Individual Options waiver have been assigned. The waiting list contains 4,000 people. There are approximately 850 people ahead of Mr. Martin on the list.

### D. Allen T.

Plaintiff Allen T. is thirty-three years old [12] and currently resides at Overlook Castle Nursing Home [13] in Millersburg, Ohio. Allen T. was admitted to Overlook twenty-five years ago when he was 8 years old.

As a result of his Annual Resident Review (ARR), speech therapy was recommended. Defendant Manuel's staff required that the speech therapy be provided by Overlook. According to plaintiffs, this requirement deprived Allen T. of specialized speech services which would maximize his independence. Speech therapy funded through a nursing home is typically short term and provided under a lesser standard than specialized services.

Allen T.'s ARR for the past two years determined that he is not appropriately placed in a nursing facility and that he requires specialized services. Allen T. has never been given this information in any manner that could be meaningful to him. In the first year, his case manager signed the consent form that documents that these alternatives were offered; the case manager's decision was that Allen T. wished to remain in the nursing facility. According to plaintiffs, a case manager is not Allen T.'s guardian and therefore does not have authority to make this decision for him.[14] In the second and more recent ARR, no consent form is found. However, the nursing home sent a form to Allen T.'s father which provided the option of Allen T. remaining in the nursing facility or

---

11. LADD group homes are licensed and receive funds from ODMR/DD.

12. Allen T. has been diagnosed as having cerebral palsy and "physical and mental retardation." He is not verbal and communicates through facial expressions, picture pointing, agitation, or occasional screaming. Allen T. cannot walk and must be transported in a wheelchair. He has spastic contractures which interfere significantly with his ability to do things for himself. Allen T. spends most of his time in his room either in bed or in his wheelchair. He rarely leaves the facility.

13. Overlook is certified under Medicaid as a nursing facility and funded by ODHS. Allen T. is eligible for and receives Medicaid benefits which pay for his care at Overlook.

14. Plaintiffs assert that the case manager made this decision for Allen T. at the direction of Holmes County BMR/DD.

being placed elsewhere.[15] His father opted that Allen remain at the nursing home, even though his father is not Allen's legal guardian and does not have the legal authority to make this decision.

Allen T.'s habilitation plan does not include goals for independence or productivity or integration into the community. A noninstitutional placement in the community has not been and is not available to Allen T.

### E. Defendants

The Ohio Department of Mental Retardation and Developmental Disabilities ("ODMR/DD") is responsible for providing administrative leadership and promoting comprehensive programs, services, training and research for persons with mental retardation and developmental disabilities.

Defendant Manuel has a duty to adopt rules establishing uniform standards and procedures under which a person or agency shall submit plans to the county BMR/DD for the development of residential services for mentally retarded and developmentally disabled individuals. Ohio Rev.Code § 5123.-04(I)(1)(a). The ODMR/DD approves proposals for the development of residential services within counties based upon the availability of funds and in accordance with the eligibility criteria set forth by the ODMR/DD. Ohio Rev.Code § 5123.04(I)(2). Pursuant to Ohio Rev.Code § 5123.351(H), defendant Manuel shall provide state funds to county BMR/DDs for special programs or projects he considers necessary, but for which local funds are not available.

The ODMR/DD owns and operates twelve developmental centers or institutions which provide care, treatment, and training to persons with mental retardation. Ohio Rev. Code § 5123.03. These developmental centers are licensed by the ODMR/DD and receive Medicaid funds under Title XIX of the Social Security Act. ODMR/DD also licenses and inspects residential facilities, which include some of the intermediate care facilities for persons with mental retardation (ICF/MRs) [16], Ohio Rev.Code § 5123.19; certifies providers of supported living (Home and Community Based Waiver programs funded by Medicaid: Supported Living programs and the Individual Options and OBRA waivers), Ohio Rev.Code § 5123.192; and promulgates rules for the county boards to certify respite care homes, Ohio Rev.Code §§ 5123.171 and 5126.05. ODMR/DD provides state funding to some of the providers of residential facilities pursuant to contract. Ohio Rev.Code § 5123.18.

ODMR/DD is required to plan and request additional appropriations for the provision of residential services for all mentally retarded or developmentally disabled persons eligible for residential services who are on waiting lists for the services. Ohio Rev.Code § 5123.182(D).

The ODMR/DD must determine whether an individual requires the level of services provided by a nursing facility (NF). Ohio Admin.Code § 5123:2–14–01(C)(3)(b)(i). The ODMR/DD must consider the most appropriate placement such that the individual's needs for treatment do not exceed the level of services which can be delivered in the NF through NF services alone or through supplemental services. Ohio Admin.Code § 5123:2–14–01(C)(3)(b)(i). The ODMR/DD must conduct an Annual Resident Review (ARR) of each individual.

The Ohio Department of Human Services (ODHS) has been designated as the single state agency responsible under 42 U.S.C. § 1396a(a)(5) for the administration of the Ohio Medicaid program. The Medicaid program is a joint federal/state program providing federal financial assistance to states that choose to participate. States are reimbursed for certain costs of medical treatment for needy persons. *Harris v. McRae*, 448 U.S. 297, 100 S.Ct. 2671, 65 L.Ed.2d 784 (1980). Ohio has elected to participate in the Medicaid program. Ohio Rev.Code § 5111.01.

---

**15.** Allen T.'s family has not visited or corresponded with him in over 20 years. Moreover, the form neither informed Allen T.'s father that placement in the nursing facility had been found inappropriate nor informed him of alternative placements.

**16.** An ICF/MR is a long term care facility certified to provide services to individuals with mental retardation or a related condition who require active treatment.

Under rules established by the ODHS pursuant to Ohio Rev.Code § 5111.011(B), individuals are evaluated before admission to a Medicaid certified facility to determine their level of care to reflect their health care and habilitative needs.

The ODHS must conduct annual inspections of care of each resident of an ICF/MR to determine (a) whether the services available in the facility are adequate to (1) meet the health, rehabilitative, and social needs of each individual, and (2) to promote his or her maximum physical, mental, and psychosocial functioning; (b) whether it is necessary and desirable for the recipient to remain in the facility; (c) whether it is feasible to meet the individual's health and rehabilitative needs through alternative institutional or noninstitutional services; and (d) whether the individual is receiving active treatment.

The involvement of the Director of ODHS in this matter is limited to his responsibility to administer the Medicaid program. Accordingly, class members who are not Medicaid recipients have no basis for any claims against defendants Tompkins and/or ODHS.

### III.

A motion questioning subject matter jurisdiction must be considered before other challenges because the Court must find jurisdiction before determining the validity of any claims brought before it. *Gould, Inc. v. Pechiney Ugine Kuhlmann*, 853 F.2d 445 (6th Cir.1988). When a court is confronted by a motion raising a combination of Rule 12(b) defenses, it will pass on the jurisdictional issues before considering whether a claim was stated by the complaint. *Northwestern Nat'l Casualty v. Global Moving & Storage, Inc.*, 533 F.2d 320 (6th Cir.1976). Therefore, the Court will first address the issue of subject matter jurisdiction.

### IV.

#### A. Eleventh Amendment Immunity

Defendants argue that the Eleventh Amendment precludes the Court from enjoining defendants

> to provide *sufficient resources* to ensure ongoing assistance for class members in

their transition to the community and to enable community residential facilities to receive immediate or ongoing training and assistance with programming to allow class members to remain in community homes.

Complaint, Prayer for Relief, ¶ 9 (emphasis added). Defendants contend that "sufficient resources" will inevitably be monetary resources taken from the state treasury, and that such relief is barred by the Eleventh Amendment.

In contrast, plaintiffs contend that plaintiffs only seek prospective, non-monetary relief, and that defendants mischaracterize plaintiffs' demand as a demand for fiscal resources. Plaintiffs maintain they are asking for an injunction to require sufficient human and programmatic resources necessary to allow plaintiffs to make an orderly transition to the appropriate community housing.

The Eleventh Amendment to the U.S. Constitution states:

> The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.

U.S. Const. amend. XI. Generally, the Eleventh Amendment is an explicit limitation to the subject matter jurisdiction of the federal courts. *See Ford Motor Co. v. Department of Treasury*, 323 U.S. 459, 467, 65 S.Ct. 347, 352, 89 L.Ed. 389 (1945). The U.S. Supreme Court has extended the Eleventh Amendment's meaning to preclude suits in federal court against a state by its own citizens. *See Hans v. Louisiana*, 134 U.S. 1, 10 S.Ct. 504, 33 L.Ed. 842 (1890). The Eleventh Amendment not only protects states from suit but may also shield state officials with immunity. *Lee v. Western Reserve Psychiatric Habilitation Center*, 747 F.2d 1062, 1065 (6th Cir. 1984).

The U.S. Supreme Court has carved out an exception to Eleventh Amendment immunity for awards of prospective injunctive relief. Federal courts have jurisdiction over suits to enjoin state officials from inter-

fering with federal rights. *Ex parte Young,* 209 U.S. 123, 160–62, 28 S.Ct. 441, 454–55, 52 L.Ed. 714 (1908). The rule is limited to actions where the relief sought is equitable in nature and prospective in operation. *Edelman v. Jordan,* 415 U.S. 651, 664–68, 94 S.Ct. 1347, 1356–58, 39 L.Ed.2d 662 (1974).

■ In *Edelman,* the Court clarified the dividing line between permissible relief and relief proscribed by the Eleventh Amendment, distinguishing between prospective and retroactive relief. In summary, the Eleventh Amendment bars the award of retroactive relief for violations of federal law which would require the payment of funds from a state treasury. *Id.,* at 663, 94 S.Ct. at 1355–56. "The federal court may award an injunction that governs the official's future conduct, but not one that awards retroactive monetary relief." *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 102–03, 104 S.Ct. 900, 909–10, 79 L.Ed.2d 67 (1984). The immunity is triggered when relief amounts to the payment of state funds as a form of compensation for past breaches of legal duties by state officials. *Edelman,* 415 U.S. at 668, 94 S.Ct. at 1358.

■ The Eleventh Amendment does not bar prospective relief that has an ancillary or incidental effect on the state treasury. *Id.* In *Edelman,* the U.S. Supreme Court stated:

> State officials, in order to shape their official conduct to the mandate of the Court's decrees, would more likely have to spend money from the state treasury than if they had been left free to pursue their previous course of conduct. Such an ancillary effect on the state treasury is a permissible and often an inevitable consequence of the principle announced in *Ex parte Young, supra.*

*Edelman,* 415 U.S. at 667–68, 94 S.Ct. at 1357–58. The Supreme Court further stated that the distinction between retroactive and prospective relief does "not immunize the States from their obligation to obey costly federal-court orders. The cost of compliance is 'ancillary' to the prospective order enforcing federal law." *Hutto v. Finney,* 437 U.S. 678, 690, 98 S.Ct. 2565, 2573, 57 L.Ed.2d 522 (1978).

■ The Court finds that plaintiffs' demand for "sufficient resources" is ancillary or incidental to the prospective relief sought by plaintiffs. Should the Court find that defendants violated federal law, the Court shall grant prospective relief. Defendants may have to provide "sufficient resources" in order to comply with an order granting prospective relief. Providing sufficient resources to comply with a court order is ancillary or incidental to prospective relief if ordered by the Court.

Moreover, plaintiffs contend that the Eleventh Amendment has no application because plaintiffs allege violations of the Americans with Disabilities Act (ADA), 42 U.S.C. §§ 12101–12213, and that, based on Congress' power to implement the Fourteenth Amendment under § 5, Congress provided for private suits against States for violations of the ADA.

■ Section 5 of the Fourteenth Amendment expressly grants Congress the authority to enforce "by appropriate legislation" the substantive provisions of the Fourteenth Amendment, which by themselves embody significant limitations on state authority. *Fitzpatrick v. Bitzer,* 427 U.S. 445, 456, 96 S.Ct. 2666, 2671, 49 L.Ed.2d 614 (1976). In *Fitzpatrick,* the U.S. Supreme Court held that "Congress may, in determining what is 'appropriate legislation' for the purpose of enforcing the provisions of the Fourteenth Amendment, provide for private suits against States or state officials which are constitutionally impermissible in other contexts." *Id.* In determining whether Congress has exercised its Fourteenth Amendment powers and has abrogated the States' Eleventh Amendment immunity, the U.S. Supreme Court requires "an unequivocal expression of congressional intent to 'overturn the constitutionally guaranteed immunity of the several States.'" *Pennhurst,* 465 U.S. at 99, 104 S.Ct. at 907 (quoting *Quern v. Jordan,* 440 U.S. 332, 342, 99 S.Ct. 1139, 1146, 59 L.Ed.2d 358 (1979)).

Section 12202 of the ADA states:

> A State shall not be immune under the eleventh amendment to the Constitution of the United States from an action in Feder-

al or State court of competent jurisdiction for a violation of this chapter. In any action against a State for a violation of the requirements of this chapter, remedies (including remedies both at law and in equity) are available for such a violation to the same extent as such remedies are available for such a violation in an action against any public or private entity other than a State. 42 U.S.C. § 12202. Section 12202 of the ADA is an unequivocal expression of Congress' intent to abrogate the States' Eleventh Amendment immunity. As such, the Eleventh Amendment does not prevent plaintiffs from making claims against defendants under the ADA.

■ Plaintiffs also maintain that Congress has abrogated the States' Eleventh Amendment immunity in actions for violations of § 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794.

In 1986, Congress enacted the Rehabilitation Act Amendments, 42 U.S.C. § 2000d–7. Section 2000d–7 states:

(A) A State shall not be immune under the Eleventh Amendment of the Constitution of the United States from suit in Federal court for a violation of section 794 of Title 29 … or the provisions of any other Federal statute prohibiting discrimination by recipients of Federal financial assistance. (B) In a suit against a State for a violation of a statute referred to in paragraph (1), remedies (including remedies both at law and in equity) are available for such a violation to the same extent as such remedies are available for such a violation in the suit against any public or private entity other than a State.

42 U.S.C. § 2000d–7.[17]

Section 2000d–7 is also an unequivocal expression of Congress' intent to abrogate the States' Eleventh Amendment immunity and reverses the Supreme Court's decision in *Atascardero State Hosp. v. Scanlon*, 473 U.S. 234, 105 S.Ct. 3142, 87 L.Ed.2d 171 (1985). *McGregor v. Louisiana State Univ. Bd. of Supervisors*, 1992 WL 189489, 1992 U.S.Dist. LEXIS 11787 (E.D.La.1992), *aff'd*, 3 F.3d 850 (5th Cir.1993). Accordingly, the Eleventh Amendment does not prevent plaintiffs from making claims against defendants under § 504 of the Rehabilitation Act.

In conclusion, should the Court find that defendants violated federal law, the provision of "sufficient resources" would be ancillary to a court order for prospective relief. Therefore, plaintiffs' demand for "sufficient resources" is not barred by the Eleventh Amendment. Moreover, the language of § 12202 of the ADA and § 2000d–7 of the Rehabilitation Act Amendments make unmistakably clear Congress' intention abrogate the States' Eleventh Amendment immunity under the ADA and § 504 of the Rehabilitation Act.

### B. Case or Controversy

Defendants contend that plaintiffs have failed to allege sufficient injury to invoke jurisdiction of the Court pursuant to Article III of the U.S. Constitution.

■ Article III of the U.S. Constitution restricts the judicial power of federal courts to cases and controversies. *Flast v. Cohen*, 392 U.S. 83, 94, 88 S.Ct. 1942, 1949, 20 L.Ed.2d 947 (1968). Plaintiffs must allege they have sustained or are immediately in danger of sustaining some direct injury as a result of the challenged statute or official conduct. *O'Shea v. Littleton*, 414 U.S. 488, 494, 94 S.Ct. 669, 675, 38 L.Ed.2d 674 (1974). "Past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief … if unaccompanied by any continuing, present adverse effects." *Id.*, at 495–96, 94 S.Ct. at 676.

■ In order to allege sufficient injury for purposes of Article III, plaintiffs must have suffered an injury in fact—an invasion of a legally-protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical. *Lujan v. Defenders of Wildlife*, —— U.S. ——, ——, 112 S.Ct. 2130, 2136, 119 L.Ed.2d 351 (1992) (citations and quotations omitted). Thus, the issue before the Court is whether plaintiffs alleged injury in fact.

---

**17.** Section 2000d–7 applies to violations that occur in whole or in part after October 21, 1986.

■ Defendants argue that the crux of plaintiffs' claims are that they prefer to reside in other residences in the community, and that plaintiffs have failed to allege any injury that has or may occur to them by continuing to reside where they are.

Plaintiffs counter that defendants' argument completely ignores plaintiffs' allegations of defendants' violations of federal law and the Constitution which have impacted upon their daily lives. Plaintiffs contend that they have alleged past exposure to illegal conduct which is accompanied by continuing, present adverse effects. Moreover, they allege current, ongoing violations of law sufficient to meet Article III case and controversy requirements.

All four plaintiffs have alleged continuous and ongoing violations of their rights under the U.S. Constitution and federal statutory law. There have been recommendations for noninstitutional placement for all four plaintiffs, yet none of the plaintiffs' habilitation plans include goals for independence or integration into the community. Plaintiffs presently live in an institution or nursing facility and desire community placement. Because they presently live in institutions and allege that they have been and are being denied community placement on account of their disabilities, the Court finds that plaintiffs' have alleged actual or imminent injury which is concrete and particularized. In short, the Court finds that plaintiffs have alleged injury in fact sufficient to invoke jurisdiction of the Court pursuant to Article III of the U.S. Constitution.

### C. Statute of Limitations

Defendants argue that the statute of limitations bars plaintiffs' claims with respect to failing to provide community placement beyond two years from the filing of the complaint.

Plaintiffs respond that they have alleged ongoing, continuous violations of law rather than a single event isolated in time. Furthermore, they argue that because the violations continued into the limitations period, the related violations identified before the two year limitations period are not barred.

■ The appropriate statute of limitations period is the two year limitations period for actions involving bodily injury or injury to personal property found in Ohio Revised Code § 2305.10. *Owens v. Okure,* 488 U.S. 235, 109 S.Ct. 573, 102 L.Ed.2d 594 (1989); *Wilson v. Garcia,* 471 U.S. 261, 105 S.Ct. 1938, 85 L.Ed.2d 254 (1985); *Browning v. Pendleton,* 869 F.2d 989, 992 (6th Cir.1989). In determining when the statute of limitations begins to run, i.e., when the cause of action accrues, the Court must follow federal law. *Dixon v. Anderson,* 928 F.2d 212, 215 (6th Cir.1991); *Sevier v. Turner,* 742 F.2d 262, 272 (6th Cir.1984). "The statute of limitations commences to run when the plaintiff knows or has reason to know of the injury which is the basis of his action. A plaintiff has reason to know of his injury when he should have discovered it through the exercise of reasonable diligence." *Sevier,* 742 F.2d at 272.

■ Some of the violations alleged by plaintiffs occurred beyond the two year statute of limitations period, and plaintiff knew or had reason to know of the alleged injury beyond the two year statute of limitations period. Nevertheless, plaintiffs allege that the violations of law are ongoing and continuous.

In *Havens Realty Corp. v. Coleman,* 455 U.S. 363, 380–81, 102 S.Ct. 1114, 1125–26, 71 L.Ed.2d 214 (1982), plaintiffs brought suit under the Fair Housing Act, 42 U.S.C. § 3604, alleging "racial steering." Four of the five incidents alleged in the complaint occurred outside the 180–day limitations period, yet the U.S. Supreme Court held that all of the incidents were actionable under a "continuing violation" theory. The Supreme Court stated:

[W]here a plaintiff ... challenges not just one incident of [unlawful] conduct ... but an unlawful practice that continues into the limitations period, the complaint is timely when it is filed within 180 days of the last asserted occurrence of that practice.... Plainly the claims ... are based not solely on isolated incidents ..., but a continuing violation manifested in a number of incidents—including at least one ... that is

asserted to have occurred within the 180–day period.

*Id.,* at 381, 102 S.Ct. at 1125 (footnote omitted).

Similarly, the Sixth Circuit stated, "If subsequent identifiable acts of discrimination occurred within the critical time period and were related to the time-barred incident, the bar does not apply." *Hull v. Cuyahoga Valley Bd. of Educ.,* 926 F.2d 505, 511 (6th Cir.), *cert. denied,* —— U.S. ——, 111 S.Ct. 2917, 115 L.Ed.2d 1080 (1991) (citing *Held v. Gulf Oil Co.,* 684 F.2d 427, 430 (6th Cir.1982)).

Plaintiffs allege they are eligible for community placement, yet they continue to live in institutions. They allege that based on their disabilities they have been denied community placement. Each time a position becomes available in the community and a plaintiff or member of the plaintiff class is denied that position on the basis of disability, there is an alleged violation.[18] Therefore, the Court finds that the acts of discrimination alleged by plaintiffs are not based solely on isolated incidents. Instead, the alleged discrimination is an ongoing and continuous violation manifested in a number of incidents, and at least one of the alleged discriminatory acts occurred within the two year statute of limitations. Plaintiffs likewise assert continuous violations of other rights under federal law. Accordingly, because the alleged violations which occurred more than two years ago are part of a continuous pattern of alleged discrimination, they are not barred by the statute of limitations.

■ In addition, plaintiffs contend that Ohio's tolling statute is part of the limitations scheme that a federal court must use for purposes of § 1983 actions. Plaintiffs argue that because Ohio Rev.Code § 2305.16 provides that the limitations period is tolled for a person who, at the time the action accrues, is "of unsound mind," the limitations period is tolled for mentally retarded persons.

Defendants rebut that "not one case has been cited wherein the tolling provision has

been applied in an action involving persons with mental retardation ..."

The Court does not find merit with defendants' argument. The definition section of the Ohio Revised Code, § 1.02(C), states: "Of unsound mind" includes all forms of mental retardation....

Ohio Rev.Code § 1.02(C); *see Bowman v. Lemon,* 115 Ohio St. 326, 329–30, 154 N.E. 317, 318–19 (1926). Thus, the Court concludes that because plaintiffs were mentally retarded at the time the action accrued, the limitations period as applied to plaintiffs is tolled.

■ The U.S. Supreme Court stated that "[l]imitations periods in § 1983 suits are to be determined by reference to the appropriate 'state statute of limitations and the coordinate tolling rules'...." *Hardin v. Straub,* 490 U.S. 536, 539, 109 S.Ct. 1998, 2001, 104 L.Ed.2d 582 (1989) (quoting *Bd. of Regents v. Tomanio,* 446 U.S. 478, 484, 100 S.Ct. 1790, 1795, 64 L.Ed.2d 440 (1980)). Borrowing the state statute of limitations includes borrowing the tolling rules unless they are inconsistent with federal law. *Tomanio,* 446 U.S. at 486, 100 S.Ct. at 1796; *Williams v. Dayton Police Dept.,* 680 F.Supp. 1075, 1079–80 (S.D.Ohio 1987). Stated otherwise, the tolling provisions cannot be inconsistent with the purpose of § 1983—providing a remedy against incursions upon rights secured by the Constitution and federal statutes. *See Hardin,* 490 U.S. at 539 n. 5, 109 S.Ct. at 2001 n. 5 (quoting *Mitchum v. Foster,* 407 U.S. 225, 239, 92 S.Ct. 2151, 2160, 32 L.Ed.2d 705 (1972)). Just as the Court in *Hardin* held that the Michigan tolling statute for persons who are imprisoned is consistent with § 1983's remedial purpose, this Court holds that the Ohio tolling statute for persons "of unsound mind" (which includes mentally retarded persons) is consistent with § 1983's remedial purpose.

Because plaintiffs were mentally retarded at the time of the violations and continue to be mentally retarded, Ohio Rev.Code § 2305.16 tolls the statute of limitations. Moreover, because plaintiffs allege ongoing

---

**18.** The Court makes this conclusion without conceding that plaintiffs have a right to community placement.

and continuous violations, their claims arising from violations beyond the two year period are not barred by the statute of limitations. Accordingly, plaintiffs' allegations of discrimination which occurred more than two years ago are not barred by the statute of limitations.

For the above reasons the Court holds that plaintiff's Complaint is not subject to dismissal under Fed.R.Civ.P. 12(b)(1).

## V.

 Defendants also move to dismiss this suit pursuant to Fed.R.Civ.P. 12(b)(6) for plaintiffs' failure to state a claim upon which relief may be granted. A district court may not dismiss a claim under Rule 12(b)(6) for failure to state a claim unless it is apparent beyond a doubt to the court that the plaintiff can prove no set of facts to support a claim which would entitle him to relief. *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957). In determining whether the facts presented in a complaint support a claim upon which relief may be granted, the district court is to liberally construe the facts in the light most favorable to the plaintiff. *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974); *Jenkins v. McKeithen,* 395 U.S. 411, 421, 89 S.Ct. 1843, 1848, 23 L.Ed.2d 404 (1969); 5A Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1357, at 304 (1990). The essence of a court's inquiry is to determine whether the allegations contained in the complaint satisfy the mandate of the Federal Rules that the complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a).

## VI.

 Plaintiffs assert defendants have violated § 504 of the Rehabilitation Act of 1973, as amended, 29 U.S.C. § 794. *See* Complaint, ¶¶ 257–64. Defendants contend that plaintiffs cannot state a claim under § 504.

Section 504 states in its pertinent part:
No otherwise qualified individual with a disability in the United States, ..., shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance....

29 U.S.C. § 794(a). The elements of a Rehabilitation Act claim are as follows:

1) that the plaintiffs are handicapped individuals as defined in the statute;

2) that they are otherwise qualified to participate in the program or activity at issue;

3) that they have been excluded from the program or activity solely by reason of the handicap; and

4) that the program or activity received federal financial assistance.

*See Henning v. Village of Mayfield,* 610 F.Supp. 17 (N.D.Ohio 1985); *see also Strathie v. Department of Transportation,* 716 F.2d 227, 230 (3rd Cir.1983); *Doe v. New York University,* 666 F.2d 761, 774 (2nd Cir. 1981); *Fitzgerald v. Green Valley Area Education Agency,* 589 F.Supp. 1130, 1135 (S.D.Iowa 1984).

 Defendants argue that § 504 does not create an affirmative duty on their part to provide services, citing *Southeastern Community College v. Davis,* 442 U.S. 397, 410–11, 99 S.Ct. 2361, 2369–70, 60 L.Ed.2d 980 (1979); and *Clark v. Cohen,* 794 F.2d 79, 84 n. 3 (3rd Cir.), *cert. denied,* 479 U.S. 962, 107 S.Ct. 459, 93 L.Ed.2d 404 (1986). As plaintiffs point out, however, at least one court in the Third Circuit has indicated that the *Clark* decision was not addressing § 504. *Halderman v. Pennhurst Sch. & Hospital,* 784 F.Supp. 215, 223–24 (E.D.Pa.), *aff'd,* 977 F.2d 568 (3rd Cir.1992).

*Davis* held that a nursing college was not required to make major adjustments to its program to accommodate a hearing impaired person. 442 U.S. at 412–13, 99 S.Ct. at 2370–71. The changes would have required the school to substantially lower its standards and diverge from its purpose of training persons to serve the nursing profession in all customary ways. *Davis* does not resemble the instant case, in which plaintiffs seek inclusion in an existing program in a way that

would, at least arguably, not impede the purpose of the program.

Moreover, it would be premature to say that if this Court found that defendants violated § 504, it would order them to expand or create new programs. The Court might, instead, simply order defendants to administer the existing residential community services program in a nondiscriminatory manner, e.g., provide community housing without regard to disability from the date of judgment.[19] Defendants' argument that they do not have an affirmative duty to provide services is not grounds for dismissal of plaintiffs' § 504 claim.

■ Defendants also contend that § 504 does not provide relief when the discrimination is between persons with different handicaps, as opposed to between handicapped persons and non-handicapped persons. In support of this proposition, defendants rely upon *Traynor v. Turnage,* 485 U.S. 535, 108 S.Ct. 1372, 99 L.Ed.2d 618 (1988) and several lower federal court decisions.[20] In *Traynor,* the petitioners challenged a regulation of the Veterans' Administration which characterized primary alcoholism as "willful misconduct," so that veterans with this disorder were unable to obtain extensions on their educational assistance benefits. The petitioners claimed that this policy violated § 504 of the Rehabilitation Act. The Supreme Court rejected the challenge, concluding that:

> The "willful misconduct" provision does not undermine the central purpose of § 504, which is to assure that handicapped individuals receive "evenhanded treatment" in relation to non-handicapped individuals. This litigation does not involve a program or activity that is alleged to treat handicapped persons less favorably than non-handicapped persons. Rather, petitioners challenge a statutory provision that treats

disabled veterans more favorably than able-bodied veterans.

\* \* \* \* \* \*

> There is nothing in the Rehabilitation Act that requires that any benefit extended to one category of handicapped persons also be extended to all other categories of handicapped persons.

*Traynor v. Turnage,* 485 U.S. at 548–49, 108 S.Ct. at 1382–83. Plaintiffs in the instant case argue that, unlike the petitioners in *Traynor,* they do not seek to qualify for benefits; they already are qualified, or at least allege they are qualified, to participate in community residential services. In addition, unlike plaintiffs in the instant case, the petitioners in *Traynor* were ultimately denied benefits not solely because of their handicap, but because their conduct was "willful." *Id.,* at 549–50, 108 S.Ct. at 1382–83; *see also Jackson v. Fort Stanton Hosp.,* 757 F.Supp. 1243, 1299 n. 36 (D.N.M.1990), *rev'd on other grounds,* 964 F.2d 980 (1992).

The Court agrees that when the above-quoted language is viewed in context, *Traynor* does not support the conclusion that § 504 can never apply in a case of discrimination on the basis of severity of handicap. The Court rejects the notion that because others served by defendants' programs also happen to be mentally retarded, discrimination suffered by plaintiffs solely by reason of their additional handicaps is not actionable under § 504. It would be manifestly unfair to view plaintiffs differently from people who are not mentally retarded in determining whether they have a claim under § 504. As plaintiffs state, "[a]lthough they are otherwise qualified for community residential services, they are denied opportunities to participate in those services to the same extent as other individuals who do not have those handicapping conditions." Plaintiffs' memorandum contra (Doc. 154) at 14.

---

**19.** Plaintiffs concede that § 504 does not create a right to community housing.

**20.** For the proposition that § 504 does not apply between different categories of handicapped persons, defendants also cite *Chiari v. City of League City,* 920 F.2d 311, 315 (5th Cir.1991); *P.C. v. McLaughlin,* 913 F.2d 1033 (2nd Cir.1990); *Fowler v. Frank,* 702 F.Supp. 143, 146

(E.D.Mich.1988); *Clark v. Cohen,* 613 F.Supp. 684 (E.D.Pa.1985); *Association for Retarded Citizens of N.D. v. Olson,* 561 F.Supp. 473 (D.N.D. 1982), *aff'd on other grounds,* 713 F.2d 1384 (8th Cir.1983). To the extent these nonbinding authorities are applicable, the Court finds them unpersuasive.

Furthermore, as a matter of statutory construction, nothing in the language of § 504 suggests that it can never apply between persons with different handicaps. Rather, the language of § 504 evinces an intent to eliminate handicap-based discrimination and segregation. A strict rule that § 504 can never apply between persons with different disabilities would thwart that goal. Such a rule would, in effect, allow discrimination on the basis of disability. The relevant inquiry is whether the application § 504 between persons with different or varying degrees of disability furthers the goal of eliminating disability-based discrimination. For example, in a case factually similar to the instant case, the court upheld the plaintiffs right to assert a claim under § 504, stating:

> The severity of Plaintiffs' handicaps is itself a handicap which, under Section 504, cannot be the sole reason for denying plaintiffs access to community programs.... Defendants' failure to accommodate the severely handicapped in existing community programs while serving less severely handicapped peers is unreasonable and discriminatory.

*Jackson,* 757 F.Supp. at 1299 (cites and footnote omitted); *see also Plummer by Plummer v. Branstad,* 731 F.2d 574 (8th Cir.1984); *Homeward Bound v. Hissom,* No. 85–C–437, slip op., 1987 WL 27104 (N.D.Okla. July 24, 1987); *Garrity v. Gallen,* 522 F.Supp. 171, 214 (D.N.H.1981);

Ultimately, the best test to determine whether plaintiffs state a claim under § 504 is to examine whether the allegations in plaintiffs' second amended complaint touch upon the four elements defendants themselves say comprise a § 504 claim. *See* defendants' consolidated motion to dismiss (Doc. 150) at 10. It is beyond dispute that plaintiffs allege that they are handicapped individuals as defined by the statute, that they are qualified to participate in defendants' community residential services program, that they have been excluded from participation in this program solely by reason of their disabilities, and that the subject pro-

gram receives federal financial assistance. *See* Complaint, ¶¶ 257–64. Hence, plaintiffs state a cause of action under § 504 sufficient to avoid dismissal under Fed.R.Civ.P. 12(b)(6).

## VII.

Plaintiffs also advance claims under Title II of the Americans with Disabilities Act of 1990, 42 U.S.C. §§ 12131–12150 ("ADA"). *See* Complaint, ¶¶ 265–80. Similar to § 504 of the Rehabilitation Act, 42 U.S.C. § 12132 provides as follows:

> Subject to the provisions of this subchapter, no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.

Defendants essentially argue that because plaintiffs cannot state a claim under § 504 of the Rehabilitation Act, plaintiffs likewise cannot state a claim under the ADA. Defendants point out that in interpreting the ADA, courts have applied case law developed under § 504 of the Rehabilitation. *See U.S. E.E.O.C. v. AIC Sec. Investigation, Ltd.,* 820 F.Supp. 1060 (N.D.Ill.1993).

The above-quoted operative language of the ADA is virtually identical to that of the Rehabilitation Act. Applying defendants' analysis, because plaintiffs state a claim under the Rehabilitation Act, it follows that plaintiffs also state a claim under the ADA.

## VIII.

Plaintiffs additionally assert claims under 42 U.S.C. § 1983, alleging that defendants have violated the subclass[21] members' rights secured by Title XIX of the Social Security Act, 42 U.S.C. § 1396 *et seq.* and the implementing regulations. *See* Second Amended Class Action Complaint, ¶¶ 281–88. Section 1983 provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the Dis-

---

21. The subclass is defined as "all persons who, in addition to being members of the class, are or will be recipients of Medicaid."

trict of Columbia, subjects or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

In general, plaintiffs may bring private causes of action under § 1983 to redress violations of rights created by federal law. *Maine v. Thiboutot,* 448 U.S. 1, 8, 100 S.Ct. 2502, 2506, 65 L.Ed.2d 555 (1980). Section 1983 speaks in terms of "rights, privileges, or immunities" rather than merely any violation of federal law. *See Golden State Transit Corp. v. Los Angeles,* 493 U.S. 103, 106, 110 S.Ct. 444, 448, 107 L.Ed.2d 420 (1989). A two-part test is used to determine whether a federal law gives rise to a cause of action under § 1983. *Id.* First, a federal law does not create a private cause of action under § 1983 if Congress did not create any enforceable rights under the particular law. *Id.; see also Pennhurst State Sch. & Hosp. v. Halderman,* 451 U.S. 1, 24–25, 101 S.Ct. 1531, 1543–44, 67 L.Ed.2d 694 (1981). Whether a federal law creates enforceable rights depends upon:

 a. whether the subject law was intended to benefit the putative plaintiff;

 b. whether the law reflects merely a congressional preference or imposes a binding obligation on the state; and

 c. whether the plaintiff's interest is so vague and amorphous that it is beyond the competence of the judiciary to enforce.

*Wilder v. Virginia Hosp. Ass'n,* 496 U.S. 498, 509, 110 S.Ct. 2510, 2517, 110 L.Ed.2d 455 (1990); *Golden State,* 493 U.S. at 106, 110 S.Ct. at 448. Second, regardless of the outcome of the above test, a private cause of action under a provision of federal law will not lie if Congress intended to foreclose it by providing a comprehensive remedial scheme within the law itself. *Golden State,* 493 U.S. at 106–07, 110 S.Ct. at 448–49; *Middlesex County Sewerage Auth. v. National Sea Clammers Ass'n,* 453 U.S. 1, 14, 101 S.Ct. 2615, 2623, 69 L.Ed.2d 435 (1981).

Both sides in the instant controversy acknowledge that the law concerning whether federal statutes give rise to the right to sue under § 1983 has been in a state of change or uncertainty since the decision of the U.S. Supreme Court in *Suter v. Artist M.,* —— U.S. ——, 112 S.Ct. 1360, 118 L.Ed.2d 1 (1992). The Court in *Suter* examined whether the "reasonable efforts" provision of the Adoptive Assistance and Child Welfare Act (AACWA) created an enforceable private right of action.

The *Suter* Court recognized that the AACWA was mandatory in its terms in that it required the States to have a plan approved by the U.S. Secretary of Health and Human Services. Specifically, the plan was required to provide that "reasonable efforts" would be made before the placement of a child in foster care to prevent or eliminate the need for removal of the child from his home and to make it possible for the child to return to his home.

Nevertheless, the *Suter* Court also noted that the language of the AACWA, its implementing regulations and its legislative history failed to provide guidance as to how "reasonable efforts" were to be measured. *Id.,* at —— – ——, 112 S.Ct. at 1368–69. Hence, although the Court in *Suter* acknowledged the States' mandatory duty, it also found that the States were given "a great deal of discretion" in determining the terms of their compliance with the AACWA. *Id.* The Court therefore concluded that Congress intended through the AACWA to impose only a rather generalized duty, and that the generalized duty was too vague to permit an inference that Congress intended to create a right enforceable through § 1983. *Id.,* at ——, 112 S.Ct. at 1370.

*Suter* did not purport expressly to overrule *Wilder* or other earlier decisions which provide a framework for analyzing whether a federal law gives rise to a private cause of action. Indeed, the *Suter* majority relied on the earlier cases, and did not profess to create a new analytical framework. The two dissenting justices in *Suter,* however, contended that the majority opinion was a drastic departure from earlier precedent, and that *Suter* effectively overruled *Wilder.*

*Suter*, at ——, ——, 112 S.Ct. at 1371, 1376 (Blackmun, J., dissenting, joined by Stevens, J.).

Since *Suter*, lower federal courts have faced some difficulty in attempting to reconcile it with prior case law. The courts that have addressed this problem have each managed, in some fashion, to harmonize *Suter* with *Wilder* and other earlier decisions. *See Miller v. Whitburn*, 10 F.3d 1315, 1318 (7th Cir.1993) (holding that cause of action existed under Medicaid provision requiring "necessary treatment" in action seeking liver-bowel transplant for five year old child); *Marshall v. Switzer*, 10 F.3d 925, 931 (2d Cir.1993) (vacating and remanding district court's dismissal of § 1983 claim under Rehabilitation Act); *Howe v. Ellenbecker*, 8 F.3d 1258, 1262 n. 5 (8th Cir.1993) (holding that claims for child support enforcement under Title IV–D of the Social Security Act were enforceable under § 1983); *Albiston v. Commissioner*, 7 F.3d 258, 265 n. 9 (1st Cir.1993) (holding that individual recipients of Aid to Families With Dependent Children (AFDC) could, under § 1983, enforce right to prompt disbursement of their child-support entitlements under Titles IV–A and IV–D); *Arkansas Medical Society v. Reynolds*, 6 F.3d 519, 524–25 (8th Cir.1993) (holding that the equal access provision of Medicaid law was enforceable under § 1983); *Chan v. City of New York*, 1 F.3d 96, 104 (2d Cir.) (holding that right of action existed under § 1983 for payment of subminimum wages in violation of § 5310 of the Housing and Community Development Act), *cert. denied*, —— U.S. ——, 114 S.Ct. 472, —— L.Ed.2d —— (1993); *Procopio v. Johnson*, 994 F.2d 325, 330–32 (7th Cir.1993) (holding that foster parents had no right of action under § 1983 to enforce provision of AACWA requiring dispositional hearing within eighteen months regarding future status of child); *Dorsey v. Housing Authority*, 984 F.2d 622, 631 (4th Cir.1993) (holding that tenants had right of action under § 1983 to enforce federal statutory rent ceiling); *Resident Council of Allen Parkway Village v. HUD*, 980 F.2d 1043, 1051–52 (5th Cir.) (holding that federal statute prohibiting use of federal funds for demolition of federally subsidized low-income housing did not create private right of action under § 1983), *cert. denied*, —— U.S. ——, 114 S.Ct. 75, 126 L.Ed.2d 43 (1993); *Stowell v. Ives*, 976 F.2d 65, 68 (1st Cir.1992) (holding that § 1983 could not be used to enforce statutory provision that Secretary of Health and Human Services shall not approve state medical assistance plan if state's AFDC payments did not meet level required by statute); *Clifton v. Schafer*, 969 F.2d 278, 283–85 (7th Cir. 1992) (holding that AFDC regulation requiring a hearing before suspending assistance did not create right enforceable under § 1983); *Wood v. Wallace*, 825 F.Supp. 177, 182–84 (S.D.Ohio 1993) (holding that parents of medically fragile or severely handicapped children had cause of action under § 1983 to enforce rights under Medicaid Act's community based waiver program to provide home and community based care instead of institutionalization); *Evelyn V. v. Kings County Hosp. Center*, 819 F.Supp. 183, 194 (E.D.N.Y. 1993) (holding that cause of action under § 1983 was not available to municipal hospital to conform to Medicaid Act's provisions relating to standard of health care).

Although the above decisions have attempted to harmonize *Wilder* and *Suter*, they have not all followed the same approach in doing so. The Seventh Circuit distinguishes *Wilder* and *Suter* cases on the basis that in *Wilder* the plaintiffs asserted the right to a plan that did not violate federal law, whereas the *Suter* plaintiffs alleged an isolated violation of a concededly legal plan. *Procopio*, 994 F.2d at 332; *Clifton*, 969 F.2d at 284. Other courts have focused on the *Suter* Court's finding that there was no congressional guidance on how to measure "reasonable efforts," and that the term imposed only a generalized duty. *Albiston*, 7 F.3d at 262; *Arkansas Medical Society*, 6 F.3d at 524; *Dorsey*, 984 F.2d at 631; *Allen Parkway Village*, 980 F.2d at 1052; *Wood*, 825 F.Supp. at 182. Courts have also recognized that *Suter* emphasized the requirement that the federal statute must unambiguously delineate the States' obligations in order to give the States' notice of what is required for participation in the funding. *Albiston*, 7 F.3d at

262–63; *Howe,* 8 F.3d at pp. 1262–1263; *Arkansas Medical Society,* 6 F.3d at 526; *Allen Parkway Village,* 980 F.2d at 1052; *Wood,* 825 F.Supp. at 182; *Evelyn V.,* 819 F.Supp. at 194; *Wood,* 825 F.Supp. at 182.

Not every court has attempted plainly to set forth exactly how the *Wilder* test should apply in the light of *Suter.* The First Circuit in *Albiston* spoke of *Suter* requiring a "threshold inquiry" before applying the *Wilder* framework. 7 F.3d at 263. In *Arkansas Medical Society,* the Eighth Circuit stated that *Suter* mandated "additional considerations." 6 F.3d at 525. The Seventh Circuit in *Procopio* refers to *Suter*'s "modified application of the *Wilder* scheme," but does not explain the modified test in detail. 994 F.2d at 332. One of the more succinct statements of a new standard harmonizing *Suter* and *Wilder* is stated by the court in *Evelyn V.:*

> The court is, of course, bound by both *Suter* and *Wilder.* In considering the pending motion, it must endeavor to reconcile their holdings, as well as those from earlier § 1983 statutory rights cases. A few principles are discerned: (1) the two-prong test first articulated in *Golden State,* and not expressly repudiated by *Suter,* remains a useful tool in considering whether a private plaintiff can sue under § 1983 to enforce statutory rights; but (2) in applying this test, courts must look carefully at the precise language of any statute relied on by plaintiffs as the source of the right they seek to enforce; and (3) the right at issue must be unambiguously conferred by the statute.

819 F.Supp. at 194. Other courts have found it unnecessary to formulate any new test. *See, e.g., Chan,* 1 F.3d at 104; *Allen Parkway Village,* 980 F.2d at 1052.

This Court agrees with the above authorities that *Suter* and *Wilder* can and must be reconciled. That *Suter* did not apply the *Wilder* framework lends some credence to the notion that *Suter* requires an additional, threshold inquiry. On the other hand, the *Suter* Court did not speak in terms of new, additional, or threshold factors. This Court finds that the best-reasoned approach was

formulated by the court in *Evelyn V.,* and essentially calls for the application of the *Wilder* framework, keeping in mind the salient facets of *Suter.* In other words, the *Wilder* framework must be viewed through the lens of *Suter.*

Hence, this Court will apply the two-step test set forth in *Wilder* and *Golden State,* under which the Court must first determine whether the provisions on which plaintiffs rely create enforceable rights,[22] and then whether Congress has foreclosed private action through a comprehensive remedial scheme. The application of this test, however, will be informed by the principles enunciated in *Suter.* Thus, in applying the *Wilder* analysis, the Court must look carefully at the precise language of the provisions to determine whether they unambiguously confer a right to plaintiffs.

Both sides in this controversy examine the subject provisions along the following lines: (1) provisions relating to inspections of care; (2) the preadmission screening and annual resident review (PASARR) provisions; (3) whether plaintiffs have rights against defendant Manuel; and (4) whether Congress has foreclosed action under the subject provisions. The Court finds that the parties' division of the provisions is logical and provides a convenient framework for addressing their arguments. The Court will therefore proceed to apply the above principals of law according to the parties' framework.

### A.

■ With regard to inspections of care, plaintiffs refer in their memorandum contra to 42 U.S.C. § 1396a(a)(31) and 42 C.F.R. §§ 456.609 and 456.609–613. 42 U.S.C. § 1396a(a)(31) provides as follows:

(a) **Contents**

A State plan for medical assistance must—

\* \* \* \* \* \*

(31) with respect to services in an intermediate care facility for the mentally retarded (where the State plan includes medical assistance for such services) provide—

---

**22.** The Court will apply the three-factor analysis articulated in *Wilder* to determine whether the Medicaid provisions give rise to enforceable rights.

(A) with respect to each patient receiving such services, for a written plan of care, prior to admission to or authorization of benefits in such facility, in accordance with regulations of the Secretary, and for a regular program of independent professional review (including medical evaluation) which shall periodically review his need for such services;

(B) with respect to each intermediate care facility for the mentally retarded within the State, for periodic on site inspections of the care being provided to each person receiving medical assistance, by one or more independent professional review teams (composed of a physician or registered nurse and other appropriate health and social service personnel), including with respect to each such person (i) the adequacy of the services available to meet his current health needs and promote his maximum physical well-being, (ii) the necessity and desirability of his continued placement in the facility, and (iii) the feasibility of meeting his health care needs through alternative institutional or noninstitutional services; and

(C) for full reports to the State agency by each independent professional review team of the findings of each inspection under subparagraph (B), together with any recommendations;

42 C.F.R. § 456.609 states:

**Determinations by team**

The team must determine in its inspection whether—

(a) The services available in the facility are adequate to—

(1) Meet the health needs of each recipient, and the rehabilitative and social needs of each recipient in an ICF; and

(2) Promote his maximum physical, mental, and psychological functioning.

(b) It is necessary and desirable for the recipient to remain in the facility;

(c) It is feasible to meet the recipient's health needs and, in an ICF, the recipient's rehabilitative needs, through alternative institutional or noninstitutional services; and

(d) Each recipient under the age of 21 in a psychiatric facility and each recipient in an institution for the mentally retarded or persons with related conditions is receiving active treatment as defined in § 441.154 of this subchapter.

42 C.F.R. § 456.613 provides as follows:

The agency must take corrective action as needed based on the report and recommendations of the team submitted under this subpart.

In accordance with *Suter*, the Court will carefully examine the precise language of these provisions to determine whether they create any rights enforceable under § 1983. Under the three part *Wilder* test, the Court must first ascertain whether the subject law was intended to benefit plaintiffs. Defendants do not argue the provisions were not intended to benefit plaintiffs, and it is, in any event, clear to the Court that plaintiffs are the intended beneficiaries. The first part of the *Wilder* test is therefore satisfied.

The Court must next inquire whether the provisions reflect merely a congressional preference or imposes a binding obligation on the state. The use of the word "must" in both 42 U.S.C. § 1396a(a) and 42 C.F.R. § 456.613 indicates that the provisions are binding obligations. *Accord Wilder*, 496 U.S. at 512, 110 S.Ct. at 2518.

The Court must next determine whether the plaintiffs' interest in these provisions is so vague and amorphous that it is beyond the competence of the judiciary to enforce. By themselves, 42 U.S.C. § 1396a(a)(31) and 42 C.F.R. § 456.609 unambiguously confer a right to have the inspections take place. Plaintiffs have a cause of action to pursue this remedy.

42 C.F.R. § 456.613, however, requires more than just the inspections. It requires that the agency "take corrective action as needed" based upon the team's report and recommendations. Here is where the principles explained in *Suter* become most relevant. Section 456.613 does not explain the meaning of "take corrective action," and there is no guidance as to the meaning of the phrase elsewhere in the code or statute. It does not explain, for instance, whether taking corrective action means the State agency

must adopt to the letter every recommendation made by the team, or whether the agency is merely required to consider the team's recommendation in deciding what action to take. Section 456.613 is susceptible to either interpretation. This provision also fails to give guidance as to when the corrective action must occur. Must it occur immediately, or may the State devise a long term plan of corrective action based on its limited resources? Plaintiffs do not have a claim under this provision because it offers no guidance on these basic questions.

For the above reasons, the Court concludes that § 456.613 and the other inspections of care provisions unambiguously confer a right upon plaintiffs only to have the subject inspections take place.

## B.

■ The Court will next address whether the PASARR provisions create any rights enforceable under § 1983.[23] With respect to PASARR, plaintiffs refer in their memorandum contra to 42 U.S.C. §§ 1396a(a)(28) and 1396r(e)(7), as well as 42 C.F.R. §§ 483.100–483.138 and 483.204. 42 U.S.C. § 1396a(a)(28) states as follows:

(a) **Contents**

A State plan for medical assistance must—

\* \* \* \* \* \*

(28) provide—

(A) that any nursing facility receiving payments under such plan must satisfy all the requirements of subsections (b) through (d) of section 1396r of this title as they apply to such facilities;

(B) for including in "nursing facility services" at least the items and services specified (or deemed to be specified) by the Secretary under section 1396r(f)(7) of this title and making available upon request a description of the items and services so included;

(C) for procedures to make available to the public the data and methodology used in establishing payment rates for nursing facilities under this subchapter; and

(D) for compliance (by the date specified in the respective sections) with the requirements of—

(i) section 1396r(e) of this title;

(ii) section 1396r(g) of this title (relating to responsibility for survey and application of remedies); and

(iii) sections 1396r(h)(2)(B) and 1396r(h)(2)(D) of this title (relating to establishment and application of remedies);

42 U.S.C. § 1396r(e)(7) states in part:

**State requirements for preadmission screening and resident review**

**(A) Preadmission screening**

**·(i) In general**

Effective January 1, 1989, the State must have in effect a preadmission screening program, for making determinations (using any criteria developed under subsection (f)(8) of this section) described in subsection (b)(3)(F) of this section for mentally ill and mentally retarded individuals (as defined in subparagraph (G)) who are admitted to nursing facilities on or after January 1, 1989. The failure of the Secretary to develop minimum criteria under subsection (f)(8) of this section shall not relieve any State of its responsibility to have a preadmission screening program under this subparagraph or to perform resident reviews under subparagraph (B).

**(ii) Clarification with respect to certain readmissions**

The preadmission screening program under clause (i) need not provide for determinations in the case of the readmission to a nursing facility of an individual who, after being admitted to the nursing facility, was transferred for care in a hospital.

**(iii) Exception for certain hospital discharges**

The preadmission screening program under clause (i) shall not apply to the admission to a nursing facility of an individual—

**(I)** who is admitted to the facility directly from a hospital after receiving acute inpatient care at the hospital,

**23.** It is not disputed that these provisions apply only to those members of the class who reside in nursing facilities or who defendants have attempted to place in nursing homes.

**(II)** who acquires nursing facility services for the condition for which the individual received care in the hospital, and

**(III)** whose attending physician has certified, before admission to the facility, that the individual is likely to require less than 30 days of nursing facility services.

**(B) State requirement for annual review**

**(i) For mentally ill residents**

\* \* \* \* \* \*

**(ii) For mentally retarded residents**

As of April 1, 1990, in the case of each resident who is mentally retarded, the State mental retardation or developmental disability authority must review and determine (using any criteria developed under subsection (f)(8) of this section)—

**(I)** whether or not the resident, because of the resident's physical and mental condition, requires the level of services provided by a nursing facility or requires the level of services of an intermediate care facility described under section 1396(d) of this title; and

**(II)** whether or not the resident requires specialized services for mental retardation.

**(iii) Frequency of reviews**

**(I) Annual**

Except as provided in subclauses (II) and (III), the reviews and determinations under clauses (i) and (ii) must be conducted with respect to each mentally ill or mentally retarded person not less often than annually.

**(II) Preadmission review cases**

In the case of a resident subject to a preadmission review under subsection (b)(3)(F) of this section, the review and determination under clause (i) or (ii) need not be done until the resident has resided in the facility for one year.

**(III) Initial review**

The reviews and determinations under clauses (i) and (ii) must first be conducted (for each resident not subject to preadmissions review under subsection (b)(3)(F) of this section) by not later than April 1, 1990.

**(iv) Prohibition of delegation**

A State mental health authority, a State mental retardation or developmental disability authority, and a State may not delegate (by subcontract or otherwise) their responsibilities under this subparagraph to a nursing facility (or to an entity that has a direct or indirect affiliation or relationship with such a facility).

**(C) Responses to preadmission screening and resident review**

As of April 1, 1990, the State must meet the following requirements:

**(i) Long-term residents not requiring nursing facility services, but requiring specialized services**

In the case of a resident who is determined, under subparagraph (B) not to require the level of services provided by a nursing facility, but to require specialized services for mental illness or mental retardation, and who has continuously resided in a nursing facility for at least 30 months before the date of the determination, the State must, in consultation with the resident's family or legal representative and caregivers—

**(I)** inform the resident of the institutional and noninstitutional alternatives covered under the State plan for the resident,

**(II)** offer the resident the choice of remaining in the facility or of receiving covered services in an alternative appropriate institutional or noninstitutional setting,

**(III)** clarify the effect on eligibility for services under the State plan if the resident chooses to leave the facility (including its effect on readmission to the facility), and

**(IV)** regardless of the resident's choice, provide for (or arrange to provide for the provision of) such specialized services for the mental illness or mental retardation.

A State shall not be denied payment under this subchapter for nursing facility services for a resident described in this clause because the resident does not require the level of services provided by such a facility, if the resident chooses to remain in such facility.

**(ii) Other residents not requiring nursing facility services, but requiring specialized services**

In the case of a resident who is determined, under subparagraph (B) not to require the level of services provided by a nursing facility, but to require specialized services for mental illness or mental retardation, and who has not continuously resided in a nursing facility for at least 30 months before the date of the determination, the State must, in consultation with the resident's family or legal representative and caregivers—

(I) arrange for the safe and orderly discharge of the resident from the facility, consistent with the requirements of subsection (c)(2) of this section,

(II) prepare and orient the resident for such discharge, and

(III) provide for (or arrange for the provision of) such specialized services for the mental illness or mental retardation.

### (iii) Residents not requiring nursing facility services and not requiring specialized services

In the case of a resident who is determined, under subparagraph (B) not to require the level of services provided by a nursing facility and not to require specialized services for mental illness or mental retardation, the State must—

(I) arrange for the safe and orderly discharge of the resident from the facility, consistent with the requirements of subsection (c)(2) of this section, and

(II) prepare and orient the resident for such discharge.

### (iv) Annual report

Each State shall report to the Secretary annually concerning the number and disposition of residents described in each of clauses (ii) and (iii).

### (D) Denial of payment

### (i) For failure to conduct preadmission screening or annual review

No payment may be made under section 1996b(a) of this title with respect to nursing facility services furnished to an individual for whom a determination is required under subsection (b)(3)(F) of this section or subparagraph (B) but for whom the determination is not made.

### (ii) For certain residents not requiring nursing facility level of services

No payment may be made under section 1996b(a) of this title with respect to nursing facility services furnished to an individual (other than an individual described in subparagraph (C)(i)) who does not require the level of services provided by a nursing facility.

### (E) Permitting alternative disposition plans

With respect to residents of a nursing facility who are mentally retarded or mentally ill and who are determined under subparagraph (B) not to require the level of services of such a facility, but who require specialized services for mental illness or mental retardation, a State and the nursing facility shall be considered to be in compliance with the requirements of subparagraphs (A) through (C) of this paragraph if, before April 1, 1989, the State and the Secretary have entered into an agreement relating to the disposition of such residents of the facility and the State is in compliance with such an agreement. Such an agreement may provide for the disposition of the residents after the date specified in subparagraph (C). The State may revise such an agreement, subject to the approval of the Secretary, before October 1, 1991, but only if, under the revised agreement, all residents subject to the agreement who do not require the level of services of such a facility are discharged not later than April 1, 1994.

### (F) Appeals procedures

Each State, as a condition of approval of its plan under this subchapter, effective January 1, 1989, must have in effect an appeals process for individuals adversely affected by determinations under subparagraph (A) or (B).

### (G) Definitions

In this paragraph and in subsection (b)(3)(F) of this section:

\* \* \* \* \* \*

(ii) An individual is considered to be "mentally retarded" if the individual is mentally retarded or a person with a relat-

ed condition (as described in section 1396d(d) of this title).

**(iii)** The term "specialized services" has the meaning given such term by the Secretary in the regulations, but does not include, in the case of a resident nursing facility, services within the scope of services which the facility must provide or arrange for its residents under subsection (b)(4) of this section.

Plaintiffs also refer to the PASARR regulations 42 C.F.R. §§ 483.100 to 483.138 and 483.204. Plaintiffs appear to cite these regulations for the proposition that in the instant case, unlike *Suter*, there is ample guidance as to the application of the statutory provisions. Memorandum contra at 28. The Court will proceed to examine these provisions to determine whether they give rise to a cause of action under § 1983.

The above provisions were intended to benefit plaintiffs.[24] Hence, the first prong of the three-part *Wilder* test is satisfied. The provisions also impose binding obligations on the state, as evinced by the use of the word "must" in 42 U.S.C. § 1396a(a)(28). In particular, the State's plan "must" provide for compliance with the "requirements" of § 1396r(e). The word "must" also appears numerous times in § 1396r(e)(7) and 42 C.F.R. §§ 483.100 to 483.138. Thus, the second requirement of *Wilder* has been met.

The Court must next examine whether the plaintiffs' interest is too vague or amorphous. Here, again, the teachings of *Suter* must inform the Court's analysis. The Court will therefore also examine the requirements of the PASARR provisions to determine if they unambiguously confer enforceable rights.

The essential mandate of § 1396a(a)(28) is that the State's plan must provide for compliance with the requirements of § 1396r(e). The first requirement stated in § 1396r(e)(7)(A)(i) is that the State must have a preadmission screening program in effect. Section 1396r(e)(7)(B)(i) and (iii)(I) provide, *inter alia*, that the State must conduct annual reviews to determine whether a resident requires the services of a nursing facility or an intermediate care facility, and whether the resident requires specialized services for mental retardation. Section 1396r(e)(7)(B)(iv) provides that the State and its mental retardation authority may not delegate their responsibility to conduct the reviews.

Sections 1396r(e)(7)(C)(i), (ii) and (iii) require the State, *inter alia*, to inform residents of institutional and noninstitutional alternatives and/or arrange for the resident's discharge if, based upon the review, it is determined that the resident does not require the services of a nursing facility. Section 1396r(e)(7)(C)(iv) requires the State to report to the Secretary annually the disposition of discharged residents. Section 1396r(e)(7)(F) requires the State to have an appeals process in effect for individuals adversely affected by determinations made in connection with preadmission screening and annual reviews.

The implementing PASARR regulations contain numerous requirements and give detailed guidance and definitions about how, when and by whom the required PASARR determinations are to be made. In sharp contrast with *Suter*, the basic requirement derived from the statutory provisions, that the State must make PASARR determinations, is supported not only by fairly specific statutory language, but also a comprehensive regulatory scheme explaining exactly how the determinations are to be undertaken. For these reasons, the Court finds that the PASARR provisions are not vague or amorphous in character, and that they unambiguously give the State notice that PASARR determinations must be made in accordance with the statutes and regulations. The third prong of the three-part *Wilder* test has therefore been met. As a result, the first part of the two-step analysis, i.e., whether an enforceable right has been created, has been satisfied with respect to the PASARR provisions.

---

**24.** Although defendants do not raise the point, in fairness it must be said that another goal of PASARR appears to be cost saving. In other words, payment for nursing facility services should not be made if such services are not required. *See* 42 U.S.C. § 1396r(e)(7)(B)(ii) and (iii), and (D)(ii).

## C.

The Court must next consider whether the PASARR provisions provide plaintiffs with a cause of action against defendant ODMR/DD or its director, defendant Manuel. Defendants argue that PASARR does not create enforceable rights against ODMR/DD or Manuel because ODHS is the single State agency designated as responsible for administration of Medicaid. *See* Ohio Rev.Code Ann. § 5111.01 (Anderson 1993). As plaintiffs point out, however, 42 U.S.C. § 1396r(e)(7)(B)(ii) provides:

**(B) State requirement for annual resident review**

**(ii) For mentally retarded residents**

As of April 1, 1990, in the case of each resident of a nursing facility who is mentally retarded, *the State mental retardation or developmental disability authority must review and determine* (using any criteria developed under subsection (f)(8) of this section)—

(I) whether or not the resident, because of the resident's physical and mental condition, requires the level of services provided by a nursing facility or requires the level of services of an intermediate care facility described under section 1396d(d) of this title; and

(II) whether or not the resident requires specialized services for mental retardation.

(emphasis added). Likewise, 42 C.F.R. § 483.106(d)(ii) specifies:

(d) Responsibility for evaluations and determinations. The PASARR determinations of whether an individual requires the level of services provided by a NF and whether specialized services are needed—

. . . .

(2) *For individuals with mental retardation, must be made by the State mental retardation or developmental disabilities authority.*

(emphasis added). In addition, 42 C.F.R. § 483.106(e)(i) provides:

(e) Delegation of responsibility—The state mental health and mental retardation authorities may delegate by subcontract or otherwise the evaluation and determination functions for which they are responsible to another entity only if—

(i) *The State mental health and mental retardation authorities retain ultimate control and responsibility for the performance of their statutory obligations.*

(emphasis added). Based on the unambiguous language of these provisions, the Court concludes that plaintiffs may maintain their PASARR claims against defendants ODMR/DD and Manuel.

## D.

The second step of the two-part analysis requires the Court to examine whether Congress intended to foreclose a private right of action by providing a comprehensive remedial framework. *Golden State,* 493 U.S. at 106–07, 110 S.Ct. at 448–49. The Court initially notes that defendants do not assert that Congress intended to foreclose an action under the inspections of care provision, 42 U.S.C. § 1396a(a)(31). Defendants do, however, argue that Congress intended to foreclose any private right of action under the PASARR provisions. In support of this argument, defendants rely solely on *Carelli v. Howser,* 923 F.2d 1208 (6th Cir.1991).

In *Carelli,* mothers who claimed to be entitled to child support sought to enjoin the State and its agencies from failing to provide enforcement services under Title IV–D of the Social Security Act, 42 U.S.C. §§ 651–669. The district court in *Carelli* denied the defendants' motion to dismiss, holding that plaintiffs could assert a claims under Title IV–D.

The court of appeals in *Carelli* reversed, holding that Congress intended to foreclose action. First, the court noted that the implementing regulations set forth an elaborate auditing system to ensure compliance, and that pursuant to statutory mandate, the State was audited by the Secretary. 923 F.2d at 1214–15. The court further reasoned that any relief the court might order would simply address the shortcomings the Secretary had already discovered and ordered corrected. *Id.* at 1216.

*Carelli* bears little resemblance to the instant case. First, in the instant case, there

is no indication that the Secretary has recently performed a comprehensive audit or that any order by this Court would simply mirror an earlier order by the Secretary. Furthermore, there is no apparent "comprehensive" system of enforcement present in the instant case. In their reply, defendants refer to the PASARR provisions as a "complex scheme" and state in rather conclusory fashion that the scheme "was intended to be enforced only by the Secretary."

The Court disagrees. The PASARR provisions, through their elaborate requirements, provide the kind of detailed guidance for enforcement that was missing in *Suter*. If the Court followed defendants' reasoning, it would be nearly impossible for a federal statutory or regulatory provision to give rise to a private cause of action. If the provision did not provide detailed guidance, it would probably fail under *Suter*. If the provision provided detailed guidance, it would still fail to create a private right of action because, according to defendants, the guidance would be viewed as a comprehensive scheme for enforcement by the Secretary. The Court does not believe such a Catch–22 was the intention of either *Suter* or *Carelli*. Indeed, the *Carelli* court was careful to point out that a finding that Congress has foreclosed a private right of action is rare and not made lightly. 923 F.2d at 1212.

Defendants also assert that the PASARR waiver provision, 42 U.S.C. § 1396r(e)(7)(E), precludes any private cause of action. Under this provision, the Secretary may waive compliance with PASARR requirements by approving an alternative disposition plan. Defendants call this discretionary waiver "comprehensive oversight." Defendants cite no authority for this proposition.

The Court fails to see how it can conclude, at this stage of the proceedings, that the waiver provision constitutes either comprehensive or limited oversight. The Court is aware, as plaintiffs note, that *Carelli* was decided on a motion to dismiss. Nevertheless, by stipulation or some other means, the court of appeals in *Carelli* had before it factual determination that the Secretary had recently performed a comprehensive audit and issued a corrective order. In the instant

case, the Court does not have before it any undisputed facts concerning a purported waiver. For this reason, the waiver provision does not provide a sufficient basis for dismissal under Fed.R.Civ.P. 12(b)(6).

The Court finds, for the purposes of defendants' motion to dismiss, that Congress did not intend to foreclose, through a comprehensive remedial scheme, a private right of action under the PASARR provisions.

## IX.

Plaintiffs also assert that a private cause of action exists under 42 U.S.C. § 1983 for violation of provisions of the Developmental Disabilities Act, 42 U.S.C. §§ 6000–6083. *See* Complaint, ¶¶ 304–312. Defendants contend that under *Suter*, plaintiffs cannot assert a cause of action under the Developmental Disabilities Act. The Court will proceed to analyze plaintiffs' putative Developmental Disabilities Act claim under the *Suter/Wilder* framework.

■ As defendants correctly note, plaintiffs rely solely on 42 U.S.C. §§ 6022(b)(4)(A) and 6023. Section 6022(b)(4)(A) states:

**(b) Plan requirements and contents**

In order to be approved by the Secretary under this section, a State plan must meet the following requirements:

\* \* \* \* \* \*

(4) The plan must contain or be supported by assurances satisfactory to the Secretary that—

(A) the funds paid to the State under section 6025 of this title will be used to make a significant contribution toward enhancing the independence, productivity, and integration into the community of persons with developmental disabilities through agencies in the various political subdivisions of the State;

Section 6023 states:

**Habilitation plans**

**(a) Condition for receipt of State allotment**

The Secretary shall require as a condition to a State's receiving an allotment under this subchapter that the State pro-

vide the Secretary satisfactory assurances that each program (including programs of any agency, facility, or project) which receives funds from the State's allotment under this subchapter (1) has in effect for each developmentally disabled person who receives services from or under this the program a habilitation plan meeting the requirements of subsection (b) of this section, and (2) provides for an annual review, in accordance with subsection (c) of this section, of each such plan.

**(b) Requirements**

A habilitation plan for a person with developmental disabilities shall meet the following requirements:

(1) The plan shall be in writing.

(2) The plan shall be developed jointly by (A) the person for whom the plan is established, (B) where appropriate, such person's parent or guardian or other representative, and (C) a representative or representatives of the program primarily responsible for delivering or coordinating the delivery of services to the person for whom the plan is established.

(3) The plan shall contain a statement of the long-term habilitation goals for the person and the intermediate habilitation objectives relating to the attainments of such goals. Such goals should include the increase or support of independence, productivity, and integration into the community for the person. Such objectives shall be stated specifically in sequence and shall be expressed in behavioral or other terms that provide measurable indices of progress. The plan shall (A) describe how the objectives will be achieved and the barriers that might interfere with the achievement of them, (B) state an objective criteria and an evaluation procedure for determining whether such objectives and goals are being achieved, and (C) provide for a case manager who will be responsible for coordinating the implementation of the plan.

(4) The plan shall contain a statement (in readily understandable form) of specific habilitation services to be provided, shall describe the personnel (and their qualifications) necessary for the provision of such services, and shall specify the date of the initiation of each service to be provided and the anticipated duration of each such service.

(5) The plan shall specify the role and objectives of all the parties to the implementation of the plan.

Section 6022(b)(4)(A) does not, in the light of *Suter*, unambiguously confer any rights upon plaintiffs. Specifically, the phrase "significant contribution" is akin to the phrase "reasonable efforts" the *Suter* Court found too vague to create a private right of action. Without further guidance, "significant contribution" does not provide the State with sufficient notice to impose a duty enforceable through § 1983. For this reason, plaintiffs do not have a private cause of action under § 6022(b)(4)(A).

■ The Court will next examine § 6023. Plaintiffs cite several decisions by district courts which held that § 6023 gives rise to rights enforceable under § 1983. *See Mihalcik v. Lensink*, 732 F.Supp. 299, 304 (D.Conn. 1990); *Nicoletti v. Brown*, 740 F.Supp. 1268 (N.D.Ohio 1987); *Gieseking v. Schafer*, 672 F.Supp. 1249 (W.D.Mo.1987). For the proposition that § 6023 does not create enforceable rights, defendants rely on *Pennhurst State School and Hosp. v. Halderman*, 451 U.S. 1, 101 S.Ct. 1531, 67 L.Ed.2d 694 (1981).

Although *Pennhurst* involved provisions of the Developmental Disabilities Act, it did not address whether a private right of action exists under § 6023. The Court finds that *Pennhurst* is inapposite with respect to this issue. *See Mihalcik*, 732 F.Supp. at 304; *Gieseking*, 672 F.Supp. at 1257. The Court will proceed with the *Suter/Wilder* analysis.

It is clear that plaintiffs are the intended beneficiaries of § 6023. It is also clear that § 6023 expresses a mandate rather than a mere preference. *See Nicoletti*, 740 F.Supp. at 1275; *see also Wilder*, 496 U.S. at 513, 110 S.Ct. at 2519, *Wood*, 825 F.Supp. at 181. The Court does not find the requirements of § 6023 to be vague or amorphous. Section 6023 plainly spells out that the State must have habilitation plans in effect. The requirements of § 6023 are sufficiently clear and detailed so as unambiguously to provide the State with notice of what is required for

participation under the plan. Lastly, there is no indication that Congress intended to foreclose a private right of action under § 6023 through a comprehensive remedial scheme.

For the above reasons, the Court concludes that plaintiffs do not have a private right of action under § 6022(b)(4)(A). The Court further concludes, however, that plaintiffs have rights under § 6023 which are enforceable through § 1983.

## X.

Plaintiffs also assert § 1983 claims under the Due Process clause of the Fourteenth Amendment to the U.S. Constitution. Plaintiffs proceed under two theories: First, they maintain that defendants have violated plaintiffs' due process rights arising under Ohio statutory law. Second, plaintiffs contend that defendants have violated their right to due process under *Youngberg v. Romero,* 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982). The Court will address these theories separately.

## A.

Plaintiffs' first due process claim is based upon liberty and property interests assertedly arising under Ohio Rev.Code §§ 5123.182 and 5123.62. Complaint, §§ 289–296. Section 5123.182(D) provides in pertinent part:

The department shall plan and request additional appropriations for the provision of residential services for all mentally retarded or developmentally disabled persons eligible for residential services who are on waiting lists for such services.

*See* Complaint, ¶ 290. Plaintiffs purport to rely on only the following provisions of § 5123.62:

The rights of mentally retarded persons include, but are not limited to:

(B) The right to an appropriate, safe, and sanitary living environment that complies with local, state, and federal standards and recognizes the person's need for privacy and independence;

(F) The right to access to necessary ancillary services including, but not limited to, occupational therapy, physical therapy, speech therapy, and behavior modification and other psychological services;

(G) The right to receive appropriate care and treatment in the least restrictive manner;

(L) The right of access to opportunities that enable individuals to develop their full human potential;

(M) The right to pursue vocational opportunities that will promote and enhance economic independence;

(N) The right to be treated equally as citizens under the law;

(P) The right to participate in appropriate programs of education, training, social development, and habilitation and in programs of reasonable recreation;

(Q) The right to participate in decisions that affect their lives;

*See* Complaint, ¶ 295.

As a threshold matter, defendants reiterate that plaintiffs' due process claims are barred by the Eleventh Amendment under *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984) (*Pennhurst II* ). The Court in *Pennhurst II* held that a suit against a state official for violation of state law is barred under the Eleventh Amendment. *Id.,* at 106, 104 S.Ct. at 911. The *Pennhurst II* Court was careful to note, however, that the Eleventh Amendment bar does not apply to federal claims, "particularly in light of the Civil War Amendments." *Id.,* at 109 n. 17, 104 S.Ct. at 912 n. 17. In the instant case, plaintiffs do not assert their claims on the sole basis of violation of state law. Rather, they allege violation of due process under the Fourteenth Amendment via § 1983. Because plaintiffs in the instant case assert a violation of federal law, the rule enunciated in *Pennhurst II* does not apply.

The parties also disagree as to whether plaintiffs' due process claims based on interests arising from state law properly come under the rubric of substantive or procedural due process. The Due Process Clause of the Fourteenth Amendment protects life, liberty and property. *Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. 532, 538 n. 3, 105 S.Ct. 1487, 1491 n. 3, 84 L.Ed.2d 494

(1985). In due process cases, once the plaintiff establishes a deprivation of life, liberty or property, "the question remains what process is due." *Morrissey v. Brewer,* 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972). Due process may dictate either substantive or procedural limitations depending on the particular deprivation at issue. *Kelley v. Johnson,* 425 U.S. 238, 96 S.Ct. 1440, 47 L.Ed.2d 708 (1976). Substantive due process "affords only those protections 'so rooted in the traditions and conscience of our people as to be ranked as fundamental.'" *Michael H. v. Gerald D.,* 491 U.S. 110, 122, 109 S.Ct. 2333, 2341, 105 L.Ed.2d 91 (1989) (plurality opinion) (quoting *Snyder v. Massachusetts,* 291 U.S. 97, 105, 54 S.Ct. 330, 332, 78 L.Ed. 674 (1934) (Cardozo, J.), *over'd on other grounds, Duncan v. Louisiana,* 391 U.S. 145, 88 S.Ct. 1444, 20 L.Ed.2d 491 (1968)). Substantive due process protects only those interests "implicit in the concept of ordered liberty." *Palko v. Connecticut,* 302 U.S. 319, 325, 58 S.Ct. 149, 152, 82 L.Ed. 288 (1937) (Cardozo, J.), *over'd on other grounds, Benton v. Maryland,* 395 U.S. 784, 89 S.Ct. 2056, 23 L.Ed.2d 707 (1969). These interests include matters of personal choice in marriage and family. *See Michael H.,* 491 U.S. at 123, 109 S.Ct. at 2341.

The Sixth Circuit has recognized two kinds of substantive due process violations: (1) those arising from a specific constitutional guarantee (other than procedural due process) or federal statute, and (2) actions that "shock the conscience." *Mansfield Apartment Owners v. Mansfield,* 988 F.2d 1469 (6th Cir.1993); *Mertik v. Blalock,* 983 F.2d 1353, 1367–68 (6th Cir.1993).[25] The Sixth Circuit has observed:

> Even if one assumes the existence of a property right, however, not every such right is entitled to the protection of substantive due process. While property interests are protected by procedural due process even though the interest is derived from state law rather than the Constitu-

tion, *substantive due process rights are created only by the Constitution.*

*Mansfield Apartment Owners,* 988 F.2d at 1477 (quoting *Charles v. Baesler,* 910 F.2d 1349, 1354 (6th Cir.1990)). Under *Mansfield,* and the other above-cited authorities, plaintiffs do not have any substantive due process rights arising under Ohio Rev.Code §§ 5123.-182 or 5123.62.

■ With respect to procedural due process, protected interests "are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law-rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." *Board of Regents v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972). "To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must, instead, have a legitimate claim of entitlement to it." *Id.* Whether a state law gives rise to a protected interest requires a close examination of the language of the relevant statute. *Kentucky Dept. of Corrections v. Thompson,* 490 U.S. 454, 461, 109 S.Ct. 1904, 1909, 104 L.Ed.2d 506 (1989). The use of expressly mandatory language along with specified substantive predicates limiting the state official's decisionmaking discretion supports a finding that the state law creates a protected liberty interest. *Id.,* at 463, 109 S.Ct. at 1910.

■ "In procedural due process claims, the deprivation by state action of a constitutionally protected interest in 'life, liberty, or property' is not in itself unconstitutional; what is unconstitutional is the deprivation of such an interest *without due process of law.*" *Zinermon v. Burch,* 494 U.S. 113, 125, 110 S.Ct. 975, 983, 108 L.Ed.2d 100 (1990) (emphasis in original). The Court in *Zinermon* stated:

> The constitutional violation actionable under § 1983 is not complete when the deprivation occurs; it is not complete unless

---

**25.** This Court respectfully disagrees with the reasoning of the court in *Nicoletti v. Brown,* 740 F.Supp. 1268 (N.D.Ohio 1987) which concluded, in essence, that a state official abuses his discretion or acts arbitrarily any time he fails to per-

form a mandatory duty created by a state statute. This Court finds that such a sweeping rule is not consistent with the above-cited binding authorities.

and until the State fails to provide due process. Therefore, to determine whether a constitutional violation has occurred, it is necessary to ask what process the State provided, and whether it was constitutionally adequate. This inquiry would examine the procedural safeguards built into the statutory or administrative procedure of effecting the deprivation, and any remedies for erroneous deprivations provided by state or tort law.

*Id.*, at 126, 110 S.Ct. at 983. A court must weigh several factors to determine what process is due:

First, the private interest that will be affected by their official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Mathews v. Eldridge*, 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18 (1976).

 The Court will proceed to address plaintiffs' statutory due process claims with the above principles in mind. The Court will first examine Ohio Rev.Code § 5123.182. Section 5123.182(D) provides that the department *"shall* plan and request additional appropriations for the provision of residential services." The Court finds that this mandatory language gives rise to an interest subject to the protections of procedural due process. *Cf. Doe v. Sullivan County, Tenn.*, 956 F.2d 545, 557–58 (6th Cir.) (holding that prisoners had protected interest arising from rules requiring that inmates be classified with regard to safety and mental disabilities), *cert. denied*, —— U.S. ——, 113 S.Ct. 187, 121 L.Ed.2d 131 (1992). Neither side in this conflict has drawn the Court's attention to any state-created procedural safeguards protecting this interest. The Court therefore concludes that plaintiffs have stated a claim for denial of procedural due process with respect to the protected interest created by § 5123.182, namely, their interest in the creation of a plan for provision of residential services for those who are eligible and on a waiting list.

 The Court will next determine whether plaintiff have viable due process claims arising from Ohio Rev.Code § 5123.62. The Court finds that the use of the term "right" gives rise to property and liberty interests that require the protection of procedural due process. With respect to § 5123.-62, however, there exists a state created remedial system. *See* Ohio Rev.Code § 5123.64. Defendants have not argued that plaintiffs are required to plead that the existing remedial scheme is inadequate. In any event, the Court finds that such an allegation is implicit in plaintiffs' Complaint. Determining whether the remedial scheme provided under § 5123.64 is adequate would require a complex factual inquiry. *See Doe v. Sullivan County, Tenn.*, 956 F.2d at 559. Such an inquiry is clearly beyond the scope of review appropriate under Fed.R.Civ.P. 12(b)(6).

Based on the above, the Court concludes that the subject state statutory provisions give rise to procedural due process claims sufficient to withstand defendants' motion to dismiss under Fed.R.Civ.P. 12(b)(6). The Court further holds, however, that plaintiffs do not have substantive due process claims based on state law.

**B.**

 Plaintiffs also assert a due process claim under *Youngberg v. Romero*, 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982). *See* Complaint, ¶¶ 297–303. In *Youngberg,* the Court held that a mentally retarded person has the right to "reasonable care and safety, reasonably nonrestrictive confinement conditions, and such training as may be required by those interests." *Id.*, at 324, 102 S.Ct. at 2462. In a later decision, the Court explained that *Youngberg* and other earlier cases:

stand only for the proposition that when the State takes a person into its custody, and holds him against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being. [cite omit-

ted] The rationale for this principle is simple enough: when the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs,—*e.g.*, food, clothing, shelter, medical care, and reasonable safety—it transgresses the substantive limits on state action set by the Eighth Amendment and the Due Process Clause.

*DeShaney v. Winnebago County Dept. of Social Services*, 489 U.S. 189, 199–200, 109 S.Ct. 998, 1005–06, 103 L.Ed.2d 249 (1989).

Defendants first argue that under *DeShaney* and its progeny, the rights described in *Youngberg* apply only to those members of the plaintiff class who were involuntarily institutionalized. Plaintiffs contend that numerous courts applying *Youngberg* and *DeShaney* have rejected the notion that the protections afforded in *Youngberg* can never apply to persons who are voluntarily institutionalized.

Plaintiffs are correct in asserting that some courts outside the Sixth Circuit have rejected the voluntary/involuntary distinction in applying *Youngberg* and *DeShaney*. *See, e.g., United States v. Pennsylvania*, 832 F.Supp. 122, 125 (E.D.Pa.1993). It appears, however, that a majority of courts addressing this issue have held that voluntarily institutionalized mentally retarded persons are not protected by *Youngberg*. *See, e.g., Dorothy J. v. Little Rock School District*, 7 F.3d 729, 733 (8th Cir.1993); *Fialkowski v. Greenwich Home for Children*, 921 F.2d 459, 465 (3d Cir.1990); *Jordan v. Tennessee*, 738 F.Supp. 258, 260 (M.D.Tenn.1990). In an unpublished opinion, the Sixth Circuit Court of Appeals held that a mental health patient was not entitled to the protections of *Youngberg* because she was voluntarily committed. *Higgs v. Latham*, 1991 WL 216464, *4, 1991 U.S.App. LEXIS 25549, *10–12 (6th Cir. Oct. 24, 1991); *cf. Id.* at *5–6, 1991 U.S.App. LEXIS 25549, at *15–20 (Suhrheinrich, J., concurring, urging use of rule that claims of negligence do not rise to constitutional level

rather than distinction between voluntary and involuntary commitment); *see also Was v. Young*, 796 F.Supp. 1041, 1047 (E.D.Mich. 1992) (recognizing *Higgs* holding).

This Court is bound by *Higgs*.[26] The Court concludes that only those members of the plaintiffs' class who are involuntarily institutionalized may assert a *Youngberg* claim.

Defendants also argue that those plaintiffs who are involuntarily institutionalized have not, in any event, stated a cause of action under *Youngberg*. In essence, defendants contend that plaintiffs fail to state a *Youngberg* claim because the claim is based, in part, on allegations such as defendants have failed to provide residential services or remove persons from institutions to community living arrangements where professionals recommend that such transfers take place. Defendants also maintain that a claim based on such allegations exceeds the rights recognized by *Youngberg* and its progeny.

■ The Court agrees that these aspects of plaintiffs' claim exceed the rights recognized by *Youngberg* and its progeny. In particular, *Youngberg* does not give rise to a right to residential placement.[27] *See Lelsz v. Kavanagh*, 807 F.2d 1243, 1250 (5th Cir. 1987); *Society for Good Will for Retarded Children v. Cuomo*, 737 F.2d 1239, 1247–49 (2d Cir.1984). Nonetheless, some portions of plaintiffs' claim are well within the scope of *Youngberg*. *See* Complaint, ¶ 299 (failure to provide support services threatens plaintiffs' health and safety), and ¶ 303(c) (failure to provide training threatens plaintiffs' safety). The allegations set forth in these paragraphs state a viable claim for relief under *Youngberg*. Those plaintiffs and members of the plaintiff class who are involuntarily institutionalized may properly assert such a claim.

## XI.

■ Plaintiffs additionally assert a claim under the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution. *See* Complaint, ¶¶ 313–320. Plaintiffs

26. The Court disagrees with plaintiffs that Sixth Circuit Rule 24 renders *Higgs* nonbinding.

27. Plaintiffs concede there is no right to community living arrangements, but nevertheless assert

that defendants' failure to provide such arrangements violates *Youngberg*.

essentially allege that they have been denied community residential services which defendants provide others, and for which plaintiffs are qualified to receive, on the basis of their disabilities. Complaint, ¶ 316.

Defendants contend that the rational basis test applies to the subject classifications, and that plaintiffs cannot maintain an equal protection claim because a distinction between different groups of mentally handicapped people is rational. In support of this proposition, defendants rely on *Heller v. Doe,* —— U.S. ——, 113 S.Ct. 2637, 125 L.Ed.2d 257 (1993). Defendants also cite *City of Cleburne, Texas v. Cleburne Living Center,* 473 U.S. 432, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985), lower federal court decisions, and refer to the arguments and authorities presented in connection with plaintiffs' Rehabilitation Act claim.

*Heller* involved an equal protection challenge to certain aspects of Kentucky's involuntary commitment proceedings, which applied different standards of proof for mentally ill and mentally retarded persons. Specifically, the Kentucky statutory scheme required proof beyond a reasonable doubt for involuntary commitment of mentally ill individuals, but only proof by clear and convincing evidence for the involuntary commitment of mentally retarded persons. Moreover, Kentucky allowed guardians and immediate family members to participate as parties in involuntary commitment proceedings of mentally retarded persons, but not in the involuntary commitment proceedings of mentally ill persons.

The Court in *Heller* held that a rational basis existed for the distinctions between mentally retarded and mentally ill persons. —— U.S. at ——, 113 S.Ct. at 2647. It is important to note, however, that the Court in *Heller* did not hold that the rational basis test was the correct legal standard. Rather, it applied the rational basis test because that test had been argued and applied in all the proceedings below. *Id.,* at ——, 113 S.Ct. at 2642.

*Heller* is not dispositive of the equal protection claim asserted in the instant case. First, *Heller* cannot properly be said to stand for the proposition that the rational basis test

applies to the instant case. Moreover, the factual similarities between *Heller* and the instant case are chimerical at best. The plaintiffs in *Heller* were mentally retarded persons. Plaintiffs in the instant action also happen to be mentally retarded persons. Unlike plaintiffs in the instant case, however, the plaintiffs in *Heller* brought their equal protection claim based on discrimination they suffered on the basis of their status as mentally retarded persons. In the instant case, in contrast, plaintiffs do not contend that they have been discriminated against because they are mentally retarded persons. Rather, they assert that they have suffered discrimination on the basis of their other disabilities or because of the severity of their mental retardation. In short, the Court does not find the distinction between mentally retarded persons and mentally ill persons to be analogous to distinctions made between persons on the basis of disabilities.

Both sides in this conflict purport to rely on *Cleburne.* In *Cleburne,* a city, acting pursuant to a municipal zoning ordinance, denied a special use permit for the operation of a group home for the mentally retarded. The Fifth Circuit in *Cleburne* concluded that mental retardation was a "quasi-suspect" classification, and that the ordinance violated the Equal Protection Clause because it did not withstand intermediate scrutiny, i.e., it did not substantially further an important government interest. The U.S. Supreme Court in *Cleburne,* however, held that classifications based on mental retardation are subject to the rational basis standard of review. 473 U.S. at 446, 105 S.Ct. at 3257. The Court nonetheless further held that the ordinance was invalid because it rested on irrational prejudice against mentally retarded persons. *Id.,* at 450, 105 S.Ct. at 3259.

■ *Cleburne,* like *Heller,* is instructive but not dispositive. Unlike the instant case, *Cleburne* involved discrimination on the basis of mental retardation. Here, the alleged discrimination is on the basis of disability or the severity of mental retardation. *Cleburne* is helpful, however, because it reiterates some basic principles about Equal Protection analysis. "The Equal Protection Clause of the

Fourteenth Amendment commands that no State shall 'deny to any person the equal protection of the laws,' which is essentially a direction that all persons similarly situated should be treated alike." *Cleburne*, 473 U.S. at 439, 105 S.Ct. at 3253. As a general rule a state law is presumed valid and will be upheld if its classification is rationally related to a legitimate state interest. *Id.*, at 440, 105 S.Ct. at 3254.

■ The general rule does not apply if the state classifies by race, alienage, or national origin. *Id.* Such classifications are seldom, if ever, relevant to the achievement of any legitimate state interest, and are subject to strict scrutiny: in order to be upheld, the classification must be "suitably tailored to serve a compelling state interest." *Id.* For similar reasons, state classifications based on gender or illegitimacy are subject to a somewhat heightened standard of review, also referred to as "intermediate scrutiny": to be sustained such classifications must be substantially related to a legitimate state interest. *Id.*, at 441, 105 S.Ct. at 3255.

■ In contrast, intermediate scrutiny is not applied to age-based classifications because the aged " 'have not experienced a "history of unequal treatment" or been subjected to unique disabilities on the basis of stereotyped characteristics not truly indicative of their abilities.' " *Id.* (quoting *Massachusetts Board of Retirement v. Murgia*, 427 U.S. 307, 313, 96 S.Ct. 2562, 2566, 49 L.Ed.2d 520 (1976)). "[W]here the individuals affected by a law have distinguishing characteristics relevant to interests the State has authority to implement, the courts have been reluctant ... to closely scrutinize legislative choices as to whether, how, and to what extent those interests should be pursued." *Id.*, 473 U.S. at 440–41, 105 S.Ct. at 3254–55. Such laws are subject only to the rational basis test: they will be upheld if they are rationally related to a legitimate state interest. *Id.*, at 441, 105 S.Ct. at 3255.

With regard to the history of unequal treatment of persons with disabilities, plaintiffs cite 42 U.S.C. § 12101(a)(7), which provides as follows:

**(a) Findings**

The Congress finds that—

\* \* \* \* \* \*

(7) individuals with disabilities are a discrete and insular minority who have been faced with restrictions and limitations, subjected to a history of purposeful unequal treatment, and relegated to a position of powerlessness in our society, based on characteristics that are beyond the control of such individuals and resulting from stereotypic assumptions not truly indicative of the individual ability of such individuals to participate in, and contribute to, society.

Defendants suggest in their reply memorandum that Congress cannot, through this provision, constitutionally overrule the U.S. Supreme Court on the issue of the proper level of scrutiny to apply to a classification. The Court disagrees. First, Congress' findings do not overrule the U.S. Supreme Court on an issue of law; rather Congress has made purely factual findings.[28] Moreover, it occurs to this Court that Congress is far better equipped than the courts accurately to make such findings. The Court cannot ignore Congress' finding.

Defendants also argue that under *Heller*, rationally-based distinctions between different groups of mentally handicapped persons are proper. As a general principle, the Court agrees. Nevertheless, the state could not, for example, permissibly use race or gender to distinguish between groups of mentally handicapped persons. Likewise, under Congress' findings in § 12101(a), a state may not permissibly distinguish between mentally handicapped persons on the basis of their disabilities when the distinction prevents otherwise qualified disabled persons from participating in an existing state program.

■ The Court acknowledges that classifications the state makes among mentally

---

**28.** This is so even though the finding is purposely couched in terms used by the U.S. Supreme

Court in equal protection cases.

handicapped persons might frequently involve "distinguishing characteristics relevant to interests the State has authority to implement," *Murgia*, 427 U.S. at 440, 96 S.Ct. at 2706. Nevertheless, classifications for purposes of providing community residential services through existing state programs do not appear to this Court to involve such state interests, and are therefore subject at least to intermediate heightened scrutiny based on Congress' findings in § 12101. Hence, to be sustained, the classifications at issue in this case must at least be substantially related to a legitimate state interest. Whether the subject classifications meet this standard cannot properly be determined in addressing defendants' motion to dismiss. As a result, plaintiffs' equal protection claim is not subject to dismissal under Fed.R.Civ.P. 12(b)(6).

## XII.

For the above reasons, defendants consolidated motion to dismiss second amended class complaint (**Doc. 150**) is **GRANTED IN PART AND DENIED IN PART.** Plaintiffs shall, within twenty (20) days of the date of this order, respond to defendants' motion to certify interlocutory appeal.

**IT IS SO ORDERED.**